LORD (FISHER v.). See Case No. 4,821.

LORD (FRANKLIN FIRE INS. CO. v.). See Case No. 5,057.

---

## Case No. 8,506.

### LORD v. GOODALL, ETC., STEAMSHIP CO.

[4 Sawy. 292; 5 Cent. Law J. 325; 1 San Fran. Law J. 52; 12 Am. Law Rev. 391.] [1]

Circuit Court, D. California. Aug. 28, 1877. [2]

INTERSTATE COMMERCE — DOMESTIC COMMERCE — PRIVITY OR KNOWLEDGE OF OWNER — CORPORATIONS AS OWNERS—CARE OF OWNER IN FITTING OUT SHIP — SEAWORTHINESS — CAUSES ARISING AFTER LEAVING PORT—DEVIATING COMPASSES.

1. Where a vessel running upon the ocean between ports of the same state carries merchandise between such ports, destined to points in other or foreign states, on through bills of lading, or carries passengers between such ports, destined to points in other states, or foreign countries, upon through tickets, she is engaged in inter-

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. 12 Am. Law Rev. 391, contains only a partial report.]

[2] [Affirmed in 102 U. S. 541.]

state and foreign commerce, and, as an instrument of such commerce, is subject to the regulating power of congress, and the provisions of section 4283 of the Revised Statutes, limiting the liability of owners, are applicable to such vessel.

[Cited in Armstrong v. Beadle, Case No. 541; In re Long Island, etc., Transportation Co., 5 Fed. 620.]

2. Where such a vessel also carries merchandise from one port to another port of destination in the same state, the provisions of section 4283 of the Revised Statutes, limiting the liability of owners of vessels for losses occurring without their privity or knowledge, are applicable to such merchandise, as well as to merchandise destined to other states or foreign countries.

[Cited in The Giles Loring, 48 Fed. 471.]

3. A party using, for the transportation of his goods, an instrument of commerce, which is subject to the regulating power of congress, must use it subject to all the limitations imposed upon its use by congress.

4. The word "privity" of the owner, used in section 4283 of the Revised Statutes, means some fault or neglect in which the owner of the vessel personally participates; and "knowledge," as used, means some personal cognizance, or means of knowledge, of which he is bound to avail himself, of a contemplated loss, or of a condition of things likely to produce or contribute to a loss, without adopting appropriate means to prevent it.

5. Where the owner is a corporation, the privity or knowledge of the managing officers of the corporation is privity or knowledge on the part of the corporation itself.

6. The owner is bound to exercise the utmost care in the selection of a competent master and crew, and in providing a vessel in all respects seaworthy; and if, by reason of any neglect or fault in these particulars, a loss occurs, the owner is in privity within the meaning of the statute.

7. If the owner exercises due care in the selection of the master and crew, and in providing a seaworthy vessel, and a loss afterward occurs, without his privity or knowledge, through the negligence of the master or crew, or from some secret defect in the ship or its equipments, which could not have been discovered or avoided by the exercise of proper care on his part, the owner's liability is within the limitation of the statute.

8. In order to be seaworthy, a ship must be furnished with suitable compasses.

9. Where a vessel is properly officered and manned, and in all respects seaworthy, when she leaves port, and a loss occurs from the subsequent negligence of the master or crew, or from other causes arising during the voyage, without the privity or knowledge of the owner, the owner's liability is within the limitations prescribed by the statute.

10. Where the ship is provided with several correct compasses, and one compass, from any cause, deviates, if the master, by the exercise of ordinary care and skill, can discover the deviation, and correct the deviating compass by the others, and thus be able to steer the proper courses, the ship is, in this respect, seaworthy.

Action [by I. W. Lord] against the owner of the vessel to recover the value of goods lost by the wreck of the steamship Ventura. The jury was instructed in accordance with the views expressed in the following opinion, and a verdict was returned for the defendants. The testimony disclosed the following state of facts: The steamship Ventura, of about 800 tons burden, from January 22, 1875, to April 20, 1876, was owned by defendant, a corporation formed under the laws of the state of California, and was running reg-

ularly upon the Pacific Ocean, as a passenger and freight ship, between the ports of San Francisco and San Diego, touching at the intermediate ports, the ports between which she was plying being some five hundred miles apart, and together with all the intermediate ports situated within the state of California. Goods, upon through bills of lading from cities in the Eastern States, were sent across the continent by rail to San Francisco, and, at the latter port, transferred to the steamer Ventura, and thence carried on said steamer to San Diego, Los Angeles, and other intermediate ports, and vice versa. So, also, passengers for Texas, Arizona and New Mexico purchased through tickets of the company from San Francisco, going by the steamer Ventura, to San Diego; thence by stage over a line deflecting into Mexico, and returning into California through the southern part of the latter state, to and through Arizona and New Mexico to Texas. Merchandise was also shipped on board said steamer, from southern ports of California, for ports in Oregon and British Columbia. On the night of April 20, 1876, while on a voyage from San Francisco to San Diego, the said steamer ran ashore at Point Sur, in a dense fog, and was wrecked, there being a total loss of ship and cargo. This action is brought against the owner to recover the aggregate value of goods amounting to some $60,000, shipped by various parties on said steamer at San Francisco, for San Diego and various intermediate ports, the respective owners having assigned their several rights of action to the plaintiff. The ship, at the time of her loss, was furnished with five compasses—one spirit and four mariner's compasses, of the usual construction. The spirit compass and one other were in the pilot-house. One compass was on the deck, in the after part of the ship, and farthest removed from the machinery, boilers, etc., and this, the testimony indicates, was regarded as the standard compass. One was in the mate's room, and the other easily accessible to the master. The testimony showed that the ship was usually steered by the spirit compass, as it was less disturbed by a rough sea. The officers of the corporation defendant testified that they procured the best compasses to be had, and that they had no knowledge of, or any reason to suspect, any defect in any of the compasses. A witness who went on the steamer as mate, seven months before, testified that at that time the spirit compass deviated from half to three-fourths of a point, and that the deviation was constant. Captain Harloe, who afterward made two voyages in the steamer as master, and the voyages immediately preceding the one in which she was lost, testified that the compasses were correct, and that he so informed Captain Fake, who commanded at the time of the loss. Captain Fake took charge of the vessel four days before her departure. He testified that he examined the compasses to see if they were correct, and found them so; that he tested them as he went out of the Heads, and they appeared correct then, and were correct on the several courses—some three or four—run before he got into the fog. But that, after the vessel struck, he looked at the spirit compass, and found that it deviated about half a point. This was the first deviation he had noticed. The mate, on the voyage, also corroborates the master as to his examination and testing of the compasses; and testified that they carried the vessel on the correct course through the several courses run before they got into the fog, and he did not notice any deviation afterward. There was nothing to show that any of the compasses, other than the spirit compass, were incorrect; but, on the contrary, the testimony was that they were correct. Since the time when the spirit compass was said to have deviated, seven months before, there had been some change in the location of the boiler and iron works, removing them considerably further from the location of the compass. The testimony, also was, that all compasses are more or less inaccurate, and are liable to deviate in some degree; that one object in having several compasses is to enable the master to discover and correct any deviation that may occur; and that where there are several good compasses on board, a competent master, by the exercise of ordinary care and skill, can correct any deviation that may chance to occur. There was testimony as to variable strong currents in the region, and before arriving at the location of the wreck. The defense was, that the accident occurred without the "privity or knowledge" of the owner of the steamer, and, there being a total loss, that the defendant is exonerated from further liability, under section 4283 of the Revised Statutes, which reads as follows: "The liability of the owner of any vessel for any embezzlement, loss or destruction, by any person, of any property, goods or merchandise shipped or put on board of such vessel, or for any loss, damage or injury by collision, or for any act, matter or thing, loss, damage or forfeiture, done, occasioned or incurred, without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel and her freight, then pending." On the part of the plaintiff it was insisted: (1) That as to the goods in question, the steamer was strictly engaged in domestic commerce within the state of California, which is wholly under the control of the state, and not subject to regulation by congress, under the clause of the national constitution, conferring power to regulate commerce with foreign nations, between the states and with the Indian tribes; and, therefore, that the statute invoked can have no application. (2) If wrong in this, that the defendant, as an implied term of its

contract, undertook, at all events, to furnish a seaworthy vessel, or, in other words, warranted the seaworthiness of the vessel, and that if from any defect, whether unknown or not, a loss occurred, the owner is responsible for the entire loss, even though he be without fault. It was further claimed that the steamer, in this instance, was not supplied with compasses suited to the navigation in which she was engaged; that in this particular she was unseaworthy, and that this defect caused or contributed to the loss.

S. F. Leib and Thos. H. Laine, for plaintiff.

Hall McAllister and Milton Andros, for defendant.

SAWYER, Circuit Judge (after stating the facts). Upon the facts as stated there can be no doubt, since the decision in the Daniel Ball, 10 Wall. [77 U. S.] 565, that the steamer Ventura was engaged in both inter-state and foreign commerce; and, as an instrument of such commerce, was subject to the regulating power of congress, notwithstanding the fact that the particular goods in question were passing only from port to port within the state of California, and constituted a portion of its domestic commerce. In the case cited the supreme court, in relation to the vessel then in question, says:

"So far as she was employed in transporting goods destined for other states, or goods brought from without the limits of Michigan, and destined to places within that state, she was engaged in commerce between the states; and however limited that commerce may have been, she was, so far as it went, subject to the legislation of congress. She was employed as an instrument of that commerce; for whenever a commodity has begun to move, as an article of trade, from one state to another, commerce in that commodity between the states has commenced. The fact that several different and independent agencies are employed in transporting the commodity—some acting entirely in one state, and some acting through two or more states—does in no respect affect the character of the transaction. To the extent in which each agency acts in that transportation it is subject to the regulation of congress."

The vessel, then, was an instrument of inter-state and foreign commerce, and as such was within the regulating power of congress. But does this power extend to a limitation of the liability of the owner as to those goods shipped upon her from one port to another, in the same state, and constituting a part of the domestic commerce of such state? This seems to be a new question, as I find no case in which it has been decided, or even discussed.

In order to provide better security for the lives of passengers, and the safety of merchandise shipped, congress in 1838 [5 Stat. 304], passed an act requiring all vessels propelled, in whole or in part, by steam, to be inspected, and forbidding their employment in commerce without first being licensed upon such inspection, and without complying with many prescribed conditions as to the manning and equipment of the vessel. It provided that a sufficient number of skillful engineers should be employed; also, for safety-valves, the number and character of boats to be carried, iron tiller-rods, hose, signal-lights, etc. In 1852 [10 Stat. 61], an amendatory act was passed, adding many other conditions, such as providing for pumps, safety-plugs, life-preservers, means of access to decks; limiting the amount of steam to be used, and the number of passengers to be carried; excluding carriage of dangerous goods; requiring license of engineers, masters, pilots; prescribing kind and quality of boiler-iron to be used, etc. These and many other onerous conditions are imposed upon owners—some as conditions precedent to the use of the vessel at all, and the observance of the others enforced by forfeitures, fines, liabilities and severe penalties, civil and criminal. All these precautions are taken for the safety and better security of life and property embarked in commerce. As a counterpoise, in some degree, to these severe and onerous conditions, and as an encouragement to citizens to build ships and engage in commerce, some limitations, also, were subsequently placed on the common-law liabilities of ship-owners, by the provisions of the statute in question, first adopted in 1851, and which, with the other provisions cited, have been carried into the present Revised Statutes. One means of security is to a certain extent substituted for the other, and it cannot reasonably be doubted, I think, that, upon the whole, the security afforded by the provisions of the statute, if properly enforced, notwithstanding the limitation of the personal liability of owners provided for, is far greater than it would be under the full common-law liability of owners without the security provided by congress. However this may be, a vessel engaged in inter-state or foreign commerce, as an instrument of such commerce, is brought within the regulating power of congress; and congress has seen fit to make these provisions, together with the changes in the responsibilities and liabilities of the owners of such vessels. Congress deals with the vessel as an instrument of commerce, and the rights and obligations of the owners as related to such instrument. The vessel, being engaged in inter-state or foreign commerce, must conform to the regulations prescribed; and any party using it for the purposes of domestic commerce, enjoys all the benefits afforded by these regulations, for they inhere in the vessel and cannot be separated from it. If a party avails himself of these benefits by the use of the vessel, he must also suffer the inconveniences inci-

dent to such use. He must take the vessel as he finds it, with all the inconveniences imposed, as well as the additional security afforded. It would be impracticable for two sovereignties to regulate the same instrument, used at the same time in different branches of commerce. If the state should attempt to regulate the vessel as to state commerce, and the national government as to inter-state or foreign commerce, it is easy to see that their regulations might be wholly inconsistent. The regulation as to all must necessarily fall to that sovereignty which is supreme or paramount as to any part, and having control of the instrument employed; and all parties availing themselves of the use of the instrument must take it as they find it, with all the responsibilities and exemptions provided by the controlling power. The power to prescribe the conditions upon which the vessel shall be employed as an instrument of inter-state or foreign commerce, necessarily carries with it the power to modify the rights of those who use it—as well those who, at the same time, make use of it for the purposes of domestic commerce as those who employ it in inter-state or foreign commerce. The steamer Ventura, being engaged in inter-state and foreign, as well as domestic commerce, the provisions of section 4283 of the Revised Statutes, limiting the liabilities of owners of vessels, are applicable to her; and the limitations apply to the goods in question as well as to goods destined to ports or places beyond the state of California.

The next question is, what is meant by a loss "occasioned or incurred without the privity or knowledge of such owner?" These words, as related to this subject, seem to have been first used in the statute of Geo. II., in 1734, where there was a restriction provided as to the liability of the owner in certain specified cases happening without the "knowledge or privity" of such owner. Eng. Adm. St. 167. The restriction was extended to other cases by statute 26 Geo. III., 1786 (Eng. Adm. St. 448). The restriction was again extended to other cases by the statute of 53 Geo. III., 1813. And in the statutes of 18 & 19 Vict., the words "privity or knowledge" were changed to "actual fault or privity." Macl. Shipp. 704. These statutes seem to form the basis of our own; and an examination of these statutes, with their preambles, will afford no little aid in arriving at a proper construction. The policy of the act is well stated in Norwich Co. v. Wright, 13 Wall. [80 U. S.] 121, and Moore v. American Transp. Co., 24 How. [65 U. S.] 39. It is quite apparent that it was intended to exonerate owners from liability beyond the value of the ship and freight pending, for losses resulting from many causes for which they were before liable; and, among them, from mere negligence or carelessness of the master or crew of the vessel—from mere general negligence of em-

ployees. So much is already determined by the supreme court in Walker v. Western Transp. Co., 3 Wall. [70 U. S.] 153, wherein the court says: "We are, therefore, of opinion that in reference to fires occurring on that class of vessels to which the statute applies, the owner is not liable for the misconduct of the officers and mariners of the vessel in which he does not participate personally." Privies, as defined by Bouvier, are "persons who are partakers, or have an interest in any action or thing, or any relation to another." One of Webster's definitions of privity is: "Private knowledge; joint knowledge with another of a private concern; cognizance implying consent or concurrence." And one definition of privy, as an adjective, is: "Admitted to the participation of knowledge with another of a secret transaction; secretly cognizant; privately knowing." As a noun, "A partaker," etc. As used in the statute, the meaning of the words "privity or knowledge," evidently, is a personal participation of the owner in some fault, or act of negligence, causing or contributing to the loss, or some personal knowledge or means of knowledge, of which he is bound to avail himself of a contemplated loss, or of a condition of things likely to produce or contribute to the loss, without adopting appropriate means to prevent it. There must be some personal concurrence, or some fault or negligence on the part of the owner himself, or in which he personally participates, to constitute such privity, within the meaning of the act, as will exclude him from the benefit of its provisions. 113 Mass. 499. It is the duty of the owner, however, to provide the vessel with a competent master and a competent crew; and to see that the ship, when she sails, is in all respects seaworthy. He is bound to exercise the utmost care in these particulars—such care as the most prudent and careful men exercise in their own matters under similar circumstances; and if, by reason of any fault or neglect in these particulars, a loss occurs, it is with his privity within the meaning of the act. But the owner, under this act, is not an insurer. If he exercises due care in the selection of the master and crew, and a loss afterward occurs from their negligence, without any knowledge or other act or concurrence on his part, he is exonerated by the statute from any liability, beyond the value of his interest in the ship and the freight pending. So, also, if the owner has exercised all proper care in making his ship seaworthy, and yet some secret defect exists, which could not be discovered by the exercise of such due care, and the loss occurs in consequence thereof, without any further knowledge or participation on his part, he is in like manner exonerated, for it cannot be with his "privity or knowledge," within the meaning of the act, or in any just sense, and the provision is that "The liability of the owner * * * for any

act, matter, or thing, loss, etc., * * * occasioned without the privity or knowledge of such owner or owners, shall, in no case, exceed the amount or value of the interest of such owner in such vessel and her freight then pending." This language is broad, and takes away the quality of warranty implied by the common law against all losses except by the act of God and the public enemy.

When the owner is a corporation, the privity or knowledge of the managing officers of the corporation must be regarded as the privity and knowledge of the corporation itself. 113 Mass. 500; [Phila. Wilmington & Balt. R. Co. v. Quigley] 21 How. [62 U. S.] 202. Where a vessel is properly officered, manned and equipped, so as to render her seaworthy when she leaves port, any loss resulting from causes arising during the voyage after she leaves port, without the privity or knowledge of the owner, will be within the protection of the statute. To render a vessel seaworthy, she must be furnished with compasses suitable for the voyage. Where there are several correct compasses, and one compass from any cause deviates, if a competent master, by the exercise of ordinary care and skill, can discover the deviation and correct the deviating compass by comparison with the others, and be thus enabled to steer the proper course, the ship, in this respect, is seaworthy. All compasses appear to be liable to deviate more or less, and it is in part to enable masters to make this correction that prudent owners provide the vessels with several.

[Verdict rendered for the defendant.] [2]