## In re EASTERN TRANSP. CO.
### THE CALVERT.

District Court, D. Maryland. December 26, 1929.

No. 1703.

356

Marbury, Gosnell & Williams, of Baltimore, Md., for petitioner.

George Forbes and Henry L. Wortche, both of Baltimore, Md., for claimant.

WILLIAM C. COLEMAN, District Judge. This case arises on a petition of the owner of the barge Calvert for limitation and exemption of liability, under Rev. St. §§ 4283–4285 (46 USCA §§ 183–185). The proceeding follows the institution of a suit in the court of common pleas of Baltimore city by the administratrix of the estate of the master of the barge Calvert, who, together with his wife and three infant children, was drowned when the barge foundered in Chesapeake Bay under the following circumstances:

On the evening of May 16, 1928, the master of the tug Denhardt made up a tow off Sparrows Point, Maryland, consisting of the barges Calvert and B. W. McDonald, all three vessels being owned and operated by the petitioner, the Eastern Transportation Company. At about 9 p. m. the tug proceeded down the Chesapeake Bay, bound for Urbana, Va.

The barges were in tandem tow, the McDonald being astern and light, while the Calvert was loaded with 750 long tons of crushed slag, taken on at Sparrows Point. The Calvert followed the tug on a 125-fathom hawser, and the McDonald followed the Calvert on a 55-fathom hawser. The weather was mild and cloudy, with a moderate southeast wind and no sea. The barge Calvert was a wooden vessel, of the flat, bilge log type, 168 feet long, 20.8 feet beam, 10 feet 9 inches draught, 368 tons gross tonnage. She was 28 years old, but had been rebuilt in 1923. Being an inland barge, she was not subject to compulsory government inspection, as are sea-going barges. The master's family were aboard by the tacit permission of the company, pursuant to common practice with barges in this type of service.

The master of the tug testified that at midnight, according to his inspection, the tow was proceeding satisfactorily, and he had retired, being relieved by the first mate, who testified that as late as 1 o'clock he found all three vessels in satisfactory condition. To the same general effect is the testimony of the master of the stern barge, the McDonald. However, about 15 minutes later, according to the master and mate of the tug, and about 5 minutes later, according to the master of the McDonald, they heard cries from the water, discovered that the barge Calvert had disappeared, and, the tug reversing her engine, it was discovered that the cries came from the mate of the Calvert, who was rescued from an overturned rowboat belonging to that barge. The tug stood by, and with the aid of a passing steamer, which used her searchlights, endeavored to find some trace of the master of the Calvert and his wife and three children. Meanwhile, the barge McDonald anchored nearby. However, the search was in vain. No trace was found either of the barge or of those on board.

There is no testimony whatsoever of any warning having been given of the Calvert's distress, other than that of the assistant engineer on the tug, to the effect that, just prior to the discovery of the fact that the Calvert had sunk, he noticed that the tug's engine slowed down slightly, which he at the time attributed to a normal dropping of the steam pressure, due to cleaning the fires. There is no evidence that there was any unusual or sudden pull or strain on either the bow or stern hawser of the Calvert. After she had disappeared, the hawsers were found intact, and were hauled aboard the tug and the McDonald by hand, except, in the case of the hawser which was brought aboard the tug,

the testimony is to the effect that, after it had been hauled partly inboard, it caught, and the rest of it had to be taken in by power, which may have indicated that, until the power was thus applied, the bight of the hawser was still remaining over the bit of the sunken barge, or had fouled something. The point where the barge sank was off Tolley's Point gas buoy, just outside the main ship channel, in about 50 feet of water.

The sole survivor of the disaster, the mate Brock, testified that he had retired to his quarters in the wheelhouse of the barge about midnight, after performing his usual lookout, and after finding that all requisite lights were properly set and burning, and that the entire tow appeared to be proceeding satisfactorily; that about 1 o'clock he felt a rush of air, and his cabin was flooded with water; that he had no more than time to utter a cry and jump overboard, when the barge disappeared; that it all happened within about 30 seconds. This was the first time he had shipped on the barge, and he possessed, or at least disclosed, little information about her condition that night. He testified that the pumps (of which there were two) were not used after the commencement of the voyage, and that she had about 2½ feet freeboard. The master of the tug testified that the barge had less than 2 feet freeboard, a condition not unusual with barges carrying nonperishable cargo of this type in the Bay.

There is no evidence of any obstruction in the course which she followed, or of the possibility of collision with another vessel, or of there having been any wash from another vessel. The bodies of the master of the barge and of his wife and two of his children were recovered, and some three weeks later the barge was raised. At that time a survey, made by an independent surveyor on behalf of the owner, disclosed that her bottom planking on the port side was scored diagonally for a length of about 75 feet, commencing about 11 feet from the stem and increasing in depth until it terminated in a hole approximately amidships. More specifically, this scoring commenced at the third plank outboard from the larboard strake and extended across the fourth, fifth, sixth, seventh, and eighth planks. For a length of some 12 feet the outside bottom, which was 3 inches thick, was splintered to its entire thickness; for some 26 feet the scoring almost completely penetrated the planking; and in the seventh and eighth planks there was a hole approximately 5 feet 9 inches long and 4¾ inches wide, all of which clearly manifested contact at some time with some external ob-

ject. There was no evidence of this scoring on either side or aft of this hole.

In addition to the above, the survey disclosed, on both the port and starboard sides, loose and open butts and seams on the bottom and side planking and bilge strake; some splintered, spongy, and decayed planking, through which the test knife could be inserted; also numerous short length graving pieces, with their butt ends adjacent in various places. Another survey made on behalf of the owner by the local inspector of hulls, and also a survey made on behalf of claimant by a private surveyor, confirmed the existence of the foregoing condition, the last-named survey, however, being to the effect that the vessel's planking and beams, and the character of repairs that were evident, were much more defective than testified to by the other surveyors. The barge had not been dry-docked since the fall of 1926, and there were no records kept of when, if ever, she had been surveyed since that time. During the five months period just prior to the disaster, approximately $300.00 had been spent upon her in repairs, some $400.00 had also been spent in 1927, and during the eleven years preceding the disaster an approximate total of $25,000 had been spent in rebuilding and in maintaining her from time to time.

 There is no evidence, nor is there any claim, of negligence due to improper navigation, or excessive or improper loading; the claim being solely one of unseaworthiness. The burden of proof is upon the claimant to establish that the foundering of the vessel was due to unseaworthiness; that is to say, although the burden of proving seaworthiness is upon the petitioner, in the first instance, even if the same be not established, it is still necessary for claimant to prove a causal connection between unseaworthiness and the foundering of the barge. In short, claimant must show a causal connection between wrong and damage in order to impose liability. If unseaworthiness be shown to have been the cause, or one of the causes, of the disaster, then the burden shifts to the petitioner, who alleges limitation of liability, to establish that the unseaworthiness was without privity or knowledge on its part. The 84-H (C. C. A.) 296 F. 427.

 In this case there is no presumption of unseaworthiness, because such only arises where a vessel sinks from unknown causes, under circumstances where nothing but unseaworthiness can explain the accident. The Transit (C. C. A.) 250 F. 71. Here there is definite evidence that the vessel was subjected to contact, at some time, with some obstruction, because this clearly appears from the scoring on, and the hole in, her bottom. However, no one has shown what caused the barge to sink, because no one saw the cause operating. The cause, therefore, must be inferred from the facts. We have these undisputed facts: First, the hole in her bottom, port side; second, a leaky condition at various other points.

As to the first, there is a total absence of direct proof as to when or how the hole was caused. There are four possibilities: First, that it was caused before the barge started on her fatal voyage. If this were true, it might tend to justify an inference of unseaworthiness; but that again would depend upon how long before the last voyage this damage had been inflicted—that is, whether there was negligence in not repairing the damage. There is no evidence, and no basis for the conclusion, that the barge could have remained afloat, as she did, had such damage occurred previous to the last voyage. In fact, the testimony most favorable to the owner on this point, namely, that of Surveyor Mitchell, employed by the owner, is to the effect that in his opinion, without the use of pumps, she would have sunk in 15 minutes.

Second, there is the possibility that the damage occurred at the commencement of the last voyage, which is the petitioner's contention; but, again, this inference is unsupported by any evidence of there having been any obstructions, such as claimed, in the path of her voyage, or of its having been reflected by any unusual pull or strain on her hawsers.

As to the third possibility, namely, that the damage was done when the barge foundered, this is contradicted to some extent by the diver, who said that he found no obstruction. On the other hand, there is nothing from him—and he was the only diver that worked around the barge's hull—to the effect that there may not have been some obstruction at or slightly back of the point where the barge finally settled, and over which she may have slid in settling, and which may not have been discovered, albeit the diver testified that four wires were passed under her stern and then forward.

Fourth, and lastly, is the possibility that the damage was incidental to her being raised and dry-docked, namely, digging her out, pumping out her cargo, fitting the slings in which she was raised, towing her with the aid of derricks in a submerged condition, and placing her in dry dock. There is no evi-

dence, however, that she was damaged in the course of these salvage operations.

A great deal of evidence was taken. On behalf of the company, testimony was given by the mate of the Calvert, by the master of the barge McDonald, by the master, mate, and assistant engineer of the tug, by the company's officials and employees in charge of repairing the barge, both before and after her foundering, by the master of another barge, who claimed familiarity with the Calvert's condition, by the diver, and by the local inspector of hulls. On behalf of the claimant, there testified the fireman on the tug, three surveyors, the claimant, also the brother of the deceased master of the Calvert, and one who had previously been employed on her.

There is testimony, supported by two itemized bills covering repairs made in the preceding January and March, given by the company's secretary and by its marine superintendent, and also by the person who last repaired the barge, that she had been kept in a good state of repair, and was entirely seaworthy at the commencement of her ill-fated voyage. There is, on the other hand, an equal abundance of testimony on behalf of the claimant, given by the fireman of the tug, by the brother of the drowned master of the Calvert, who had worked with him on a previous voyage on the Calvert, and had also worked on the tug, but who, at the time of the trial, was no longer employed by the company, by another ex-employee on the Calvert, and by the claimant, all of which testimony, summarized, is to the effect that the barge was notoriously leaky, that her master was constantly complaining to the company of her unseaworthy condition and requesting repairs, which were never made; that on several prior voyages she had been pumped every two hours, and would take in as much as 12 inches of water per hour; that her master had been seen stopping leaks in her the night before she left on her last trip. The barge's log for this last voyage was not produced, the company's officials stating that it was not recovered after the disaster. Nor were any of her other logs produced, it being stated that it was not customary for the company to keep them.

All of the above testimony, both for and against the petitioner, is subject to the greatest scrutiny, because of the respective interests of the various witnesses, and the manifest bias with which their testimony was given. The court, therefore, concludes that, if the cause of the foundering is capable of accurate determination, it is to be ascertained, not through the mouths of any of the afore-mentioned witnesses, but through the testimony of one or more of the surveyors.

This is particularly true with respect to the survey made by Mr. Mitchell, a very intelligent and highly experienced person, because of the time when and the circumstances under which he made it. He was fully familiar with what had happened, and why the survey was desired, and it may reasonably be assumed that he was anxious to report as favorably as he could on behalf of the company that had employed him. Indeed, this part of the evidence appears to be the only part not greatly affected by bias. In reaching this conclusion, the court cannot blink the fact that an effort was made to withhold Mitchell's survey. He was not called to testify by the petitioner, but was produced by claimant, and then his survey was introduced over objection by petitioner.

Let us analyze the testimony of all four surveyors. Mitchell's testimony is that, even without the use of her pumps, it would have taken the Calvert at least 12 hours to sink, assuming that the hole heretofore described in her port side was nonexistent. With that hole, he testified that she could not have kept afloat, in his opinion, more than 15 minutes after it was made. Inspector Tyler, on the other hand, says that the barge in his opinion remained afloat for some 4 hours after receiving this injury, because, as he claims, she must have struck some obstruction, such as a submerged anchor, or pile of slag, at Sparrows Point. He expressed no opinion as to how long the barge could have remained afloat without this injury and without the use of her pumps.

On behalf of claimant, Surveyor Stein testified that in his opinion the barge could not have remained afloat with such an injury more than an hour, and also that, independently of this hole in her bottom planking, she was full of leaks. In short, he describes her as being otherwise most unseaworthy. His testimony, however, is the least reliable, because it gave the impression of a great deal of bias, and of exaggerating the bad condition of the vessel's hull. Lastly, Surveyor Davie, who had never seen the vessel, disagreed with all three of the other surveyors, and expressed the opinion, based on hypothetical questions, that an accumulation of leaks, aggravated by a patch between three and four feet long and eight inches wide, found on her port side, towards the stern, just above the light load line, directly contributed to the foundering. He expressed the view that the other opening, heretofore described, had nothing to do with her founder-

ing, because, as he claimed, the obstruction that caused the damage would have remained in the opening, and also because the tug, being in direct line with the barge and drawing as much water, would have struck the same object, and those on board would have felt the impact. He felt, therefore, that this damage was caused as the barge foundered. He expressed no opinion as to how long the barge could have been kept afloat, had she not received the major injury heretofore described, and without the use of her pumps.

It should here be said that the court attaches little weight to the existence of the patch just referred to. There is much conflict in the evidence with respect to what purpose this patch was intended to serve, the owner's witnesses claiming it was merely a remnant of the ice sheathing which it is customary to place on such barges, or was an improvised patch placed by the master, or some unknown person, a long time previous to the disaster, over an inconsequential scar, because this scar did not penetrate through the outer planking. On the other hand, claimant's witnesses contend that the patch did cover a plank that was not water-tight. The court leans to the former view, because more reasonable from the character of the patch, and gives little stress to this portion of the testimony.

In addition to the fact that the testimony of Mitchell is prima facie to be accorded special weight, for the reasons heretofore explained, it seems to the court that his testimony alone serves as a logical index to the real cause of the foundering. First, it is an established fact, because viewed by three of the four surveyors, that this substantial hole existed, and there is no real dispute as to its location and size. Second, Mitchell's statement that it was impossible for the barge to have remained afloat more than 15 minutes after such damage was inflicted upon her bottom is not contradicted, except by the testimony of Mr. Tyler, which, disregarding any possible bias affecting his testimony, does not stand the test of analysis, because his theory of how and when the damage occurred, namely, at the commencement of the voyage, some four hours before the foundering, is based on the premise that through the hole water entered and quickly filled the space, about 10 inches deep, between the outer planking and the inner bottom or ceiling of the barge; that thereupon, through the latter, which was not itself water-tight, and, like the outer bottom, only 3 inches thick, water gradually leaked, which with the gradual settling, caused air pressure within the barge, with the inevitable result that the ceiling and the hatches blew up, all reserve buoyancy disappeared, and the barge sank almost immediately. It is erroneous to assume that this in fact took place, because there is no evidence that the inner bottom or ceiling of the vessel gave way. On the contrary, the evidence is to the effect that, after the disaster, this part of the vessel was not seriously impaired; that is, the ceiling had not given way. Furthermore, this witness admitted that he had not gone down into the barge after she was raised, so had not made an inspection of her ceiling, and was generally less familiar with vessels of this type than was Surveyor Mitchell.

We, therefore, reach this question: Are we warranted, on all of the evidence, in believing Surveyor Mitchell, when he says that the barge could not have remained afloat with this damage for longer than a small fraction of the time consumed in the trip from Sparrows Point to the spot where she foundered? Or, is it the more reasonable to believe the theory of Inspector Tyler, who calculates, in support of his theory, that a vessel of this type will settle about one inch for every eight tons of added displacement; that the Calvert had, at the commencement of her voyage, 30 inches freeboard, so to put her decks under would require her to take in 240 additional tons; that the hole in her bottom, estimated as 30 feet long and 5 inches wide, would permit of the ingress of water at the rate of something over 500 tons per minute, or approximately one-half of this amount in 30 seconds, which was the length of time her mate claimed it took her to disappear?

The court feels compelled to accept the opinion of Surveyor Mitchell, because the internal physical condition of the barge after she was raised belies the very premise on which Inspector Tyler's theory is based, namely, that the "ceiling" blew up. The court reaches this conclusion independently of the following argument, advanced by claimant, which, though plausible, is not persuasive for the reasons here stated: It is argued that, since the draught and the beam of the tug were virtually the same as that of the barge, and their courses were in direct line, this would indicate that, if the barge had struck something off Sparrows Point, the tug probably would have done likewise in advance, and with sufficient force to have had the attention of those on board called to it, and their interest in the case would have impelled them to have disclosed, most willingly, this fact, if such were true, even assuming that, because of the greater bulk and less buoyancy of the Calvert, her striking

would not have evidenced itself by sufficient jar of that vessel, or strain on her hawsers, to attract attention. The answer to this argument is that the two vessels were of such different construction, namely, the barge was much flatter, with broader bilges than the tug, that unless the two vessels were *exactly* in line, which, of course, is not to be assumed, the barge would obviously be more likely to strike than the tug, especially since the highest point of the obstruction was narrow or pointed, as evidenced by the damage produced.

A further argument made by claimant carries more weight. It is to the effect that, since there was no mark or abrasion behind or on either side of the opening, such as it is reasonable to assume must have been made if the vessel, while afloat, freed itself from the obstruction, this indicates that the damage was not caused before she sank. Had the barge freed itself while under way from the obstruction, such escape would, it would seem, have been evidenced by greater injury to the planking at the last point of contact. This is borne out by the fact that at no time after leaving Sparrows Point is the Calvert shown to have been in shallow water, by the fact that there is no evidence of there having been any such submerged obstruction as claimed in the course that she took, and, lastly, by the fact that the vessel's loaded draught was six inches greater aft than forward.

What, then, is the inevitable result of the weight of the credible evidence? That the hole was caused either as the Calvert foundered, or in the course of the salvage operations. While there is no evidence that the injury was inflicted in the course of the salvage operations, this inference is the more reasonable because of the means, heretofore described, that had to be employed in order to raise her and get her to dry dock; that is to say, the chances of causing this kind of injury to her were very substantial. No one saw the vessel's bottom until she was drydocked. Then, for the first time, the scoring and the hole became known. The damage may have been due to no negligence on the part of the salvors, but to the difficulties surrounding their task.

A conclusion that the injury occurred in the course of the barge's foundering is entirely justified on the evidence, although, as just stated, it seems to the court more probable that the damage occurred later. It is significant that there is no testimony tending to contradict this alternative conclusion, other than what the diver said, to the effect that the barge's bow was completely submerged in mud and her stern was high, enabling him to pass lines freely under her stern and to move them forward without finding any obstruction. But it is to be noted that there is no testimony from this diver, or from any one else, respecting the character of the bottom of the Bay at this locality, other than immediately surrounding the barge. In view of the established fact that the barge sank by the head, as evidenced by the diver's testimony and by the fact that she was under way, it is a reasonable conclusion that her momentum, at the time her buoyancy was lost and she began to founder, carried her ahead at least for a short distance, and it may, therefore, reasonably be assumed that, before finally settling in the thick mud, she struck some rock or other obstruction. During the time which elapsed between her foundering and the first examination that was made of her by any one, namely, some three weeks, the tides, and the character of the Bay's bottom where she sank, make it clearly apparent that she may well have settled more by the head, or have otherwise had her position sufficiently shifted to have raised her clear of the obstacle, a rock, or whatever it was, along which she scraped and rested as she sank.

Having thus determined that the hole in the barge's bottom was not the cause of, but was made either during or after, her foundering, the cause still remains undetermined. As we have seen, Surveyor Mitchell testified that the barge's general condition indicated to him that, without the use of pumps, assuming she had not received the injury to her bottom, she could have remained afloat some 12 hours. He stated that in his opinion she was seaworthy for the type of cargo she carried, but only if her pumps were taken into consideration. The court believes that this testimony of Mitchell, coupled with his survey, is the best evidence of the vessel's condition at the time in question, and proves that she was then unseaworthy. The various defects that were found have already been enumerated—on both port and starboard sides, loose and open butts and seams on the bottom and side planking and bilge strake; other planking splintered and decayed, also numerous short-length graving pieces with butt ends adjacent in various places. Manifestly, it is not possible to calculate with any degree of precision just how long a vessel, having such a variety of defects and leaky places, might remain afloat.

Seaworthiness of a vessel of this type on such a voyage cannot be made to depend upon her pumps, or upon how often they are used. They are an auxiliary merely, an aid to seaworthiness, not a sine qua non of staying afloat, except in actual emergency. Therefore it may fairly be said of Mitchell's testimony on this point that it was an attempt "to soften" the story that his survey told, and that he was in error as to the probable length of time a vessel in such condition *could* remain afloat. The fact remains that she *did* sink, and all of the evidence bears out the conclusion that it must have been caused by a combination of the various defects in her seams and planking (after all due allowance is made for the added damage caused to her seams and planking, due to warping and straining while being raised), permitting the ingress of water slowly, but constantly, until her buoyancy was suddenly lost and she sank. Mitchell testified that he found a lot of decayed material in the Calvert. She was 28 year old, and, while she was rebuilt in 1923, she had not been drydocked for a year and a half, and there is no evidence that any repairs had been made upon her following a stormy voyage which she had taken the previous April. Furthermore, only a comparatively small amount of repairs had been made during the previous 15 months, and there is no evidence of any surveys having been made, which would have shown her exact condition prior to the disaster.

All of these circumstances lead to the inevitable conclusion that the gradual intake of water, for how long will never be known, but for at least a considerable time prior to her actual foundering, was the cause of her going down; and the fact that her gradual settling, which must have taken place before the final sinking, was not noticed by her mate, is not unnatural, because of her character and size and that of her cargo, and the fact that she started out with very little freeboard. A fortiori no weight is to be given to the fact that those on the other barge and the tug detected no settling, because of the distance that they were separated from the Calvert.

The weight of the evidence leads fairly to the conclusion of unseaworthiness. The unusual character of the disaster, its suddenness, and the fact that it has forever sealed the lips of those who presumably could best explain the cause, invite speculation. It is easy to assert that the cause is beyond explanation, but a complete analysis of the evidence does not reasonably permit us to do so.

Having determined that unseaworthiness was the cause of the disaster, before considering the question of whether petitioner's liability is limited, because of absence of privity or knowledge of unseaworthiness on its part, we must examine the argument advanced by petitioner that the master of the Calvert knew, or is presumed to have known, the unsafe condition of his vessel, and that therefore there can be no recovery.

■ The present claimant, Mrs. Insley, has brought her suit as administratrix under the Merchant Marine Act of 1920, § 33 (46 US CA § 688), which gives a right of action at law, with trial by jury, for personal injury or death. This act has not impliedly repealed the limitation of liability statute. Prosecution of the pending suit may properly be enjoined. The present action is essentially an equitable proceeding. It partakes of the features of a bill to enjoin multiplicity of suits. The Edward, 266 U. S. 355, 45 S. Ct. 114, 69 L. Ed. 324.

Petitioner argues that the doctrine of assumption of risk exists in admiralty, just as in common law, with the exception that it will not be held applicable where seamen are required to use defective appliances, but that this is different from a case where the master of a vessel, knowing its defective condition, remains in command, he being at liberty to leave. In support of this contention, petitioner argues that, if the master of the barge, instead of having lost his life, had been injured by the foundering of his vessel, it would be extraordinary, upon his testimony that the vessel was leaking so badly that he knew, at the time he began the voyage, she was likely to sink, for the court, in the face of such testimony, to allow him recovery for his injuries.

However, this argument seems to the court to assume facts which are nonexistent. The mere statement of this argument is a contradiction of the evidence upon which the petitioner relies to defeat recovery, and which the court adopts as true, namely, that, whenever Insley's attention was called to an unseaworthy condition in his vessel, he not only reported it with reasonable promptness, but that petitioner, with equal promptness, remedied *all such conditions so reported.* Whether petitioner was under obligation to do more will be hereinafter considered.

■ In order for assumption of risk to constitute a defense to an action by a seaman for damages for personal injuries incurred in the scope of his employment, under the Merchant

Marine Act of 1920, the act of the seaman in assuming the risk must have been voluntary and not under restraint. But, even if it was, the seaman does not assume risk that results from defects of the character disclosed in the present case. See Panama Railway Co. v. Johnson (C. C. A.) 289 F. 964.

While in the present case it is true Insley could have quit his job, we are unwilling to say that, because he did not do so and was in charge of the barge, he was therefore presumably in a position to know its defects, and assumed the risk of its unseaworthiness. This would be too harsh a doctrine, and one which we believe has never been adopted in admiralty. The duty of the owner of a vessel to see that she is seaworthy is positive, and not assignable. Courts of admiralty should be loath to stretch the doctrine of assumption of risk to enable owners to avoid their clearly defined responsibility. Furthermore, there seem to be special reasons in this case for not adopting the view of petitioner. The master of the barge was in effect not a captain or master, within the general acceptation of those terms, but was simply an attendant on the barge. A bargee has not the power and authority of a shipmaster. Cohannet-Wyandotte, 1927 A. M. C. 1542. His position, if not identical with, is at least very similar to, that of an ordinary seaman. It, therefore, is not to be presumed that Insley had the same degree of knowledge that the master of another type of vessel should possess, nor did he have the same ability to acquire it. This is confirmed by the fact that the defects which caused the unseaworthiness were defects which were primarily latent, as far as those on the barge were concerned, namely, defects in the hull, which could only be properly recognized and attended to by hauling the vessel out. Also, because of the fact that it is customary for barges to leak somewhat more than other types of vessels without rendering them actually unseaworthy, it seems unreasonable to say that Insley was responsible for detecting the exact amount of leaking that might have been going on prior to the foundering. The construction of the vessel, the type and character of the cargo, render this difficult, if not, in fact, impossible. Such cases as The Scandinavia (D. C.) 156 F. 403, are clearly distinguishable. In The Scandinavia, libelant's attention had been called to the defective condition of the appliance in question, and he was instructed how to use it. In the present case there was no such warning, and it would be unreasonable to impute to the bargee knowledge sufficient to warn him.

We come, then, to the final question whether, although the Calvert has been found to be unseaworthy, although her unseaworthiness was the cause of her foundering, and although the master did not assume the risk incident to her unseaworthiness, the petitioner may nevertheless limit its liability on the ground of no privity or knowledge of her unseaworthiness?

Revised Statutes, § 4283 (46 USCA § 183), provides as follows: "The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." See, also, Supreme Court Admiralty Rule No. 51 [28 USCA § 723].

This statute is based upon the original Act of March 3, 1851, which was modeled on the English statutes. Its purpose was to encourage shipbuilding, and the employment of ships in commerce. The Republic (C. C. A.) 61 F. 109. It applies to cases of personal injury and death, as well as to cases of loss of or injury to property. Craig v. Continental Insurance Co., 141 U. S. 638, 12 S. Ct. 97, 35 L. Ed. 886. Corporations are entitled to its benefits. Pocomoke Guano Co. v. Eastern Transportation Co. (C. C. A.) 285 F. 7; Standard Wholesale Phosphate & Acid Works v. Chesapeake Lighterage & Towing Co. (C. C. A.) 16 F.(2d) 765.

The word "privity" of the owner, as used in the statute, means some fault or neglect in which the owner personally participates. The word "knowledge," as used, means some personal cognizance, or means of knowledge, of which the owner is bound to avail himself, of a contemplated loss, or of a condition of things likely to produce or contribute to a loss, without adopting appropriate means to prevent it. Lord v. Goodall, etc., S. S. Co., 15 Fed. Cas. 884, No. 8506; Id., 102 U. S. 541, 26 L. Ed. 224. Mere negligence does not necessarily establish existence on the part of the owner of "privity or knowledge." La Bourgogne, 210 U. S. 95, 28 S. Ct. 664, 52 L. Ed. 973; The Virginia (D. C.) 264 F. 986; Id. (C. C. A.) 278 F. 877. When the owner is a corporation, the privity or knowledge must be that of the managing officers of the corporation. Craig v. Conti-

nental Insurance Co., supra. That is to say, corporations are chargeable with knowledge of the existence of defects, or become privy to acts of negligence causing the same, only when persons representing the corporations in such capacities as to speak for it are guilty of some negligence or omission to maintain the vessel in a seaworthy condition. Pocomoke Guano Co. v. Eastern Transportation Co., supra.

Does the evidence in the present case disclose such privity or knowledge on the part of the responsible representatives of the petitioner company? Of the officers of the company, those who testified were its secretary and its marine superintendent. The former stated that he last saw the barge during the preceding March, and that her condition then was excellent. The latter testified that he had been aboard the Calvert about a month before she sank, and that he then found her in first-class condition. He admitted, however, that the company made no regular seasonal inspection of its floating equipment, which consisted of 46 barges and 9 tugs, although he was accustomed to visit this barge, as well as the other floating property of the company, sometimes as often as twice a week, if it happened to be in Baltimore harbor. He was charged with the duty of superintending the condition of this equipment.

The Calvert was purchased in 1915 for $5,500. Her value just before she sank was given by petitioner as $4,000. She, like the company's other barges, was not insured. The secretary of the company stated that she was last in dry dock in October, 1926, and there is no evidence that on the last inspection of her by either of these officials did they make more than a cursory examination, although it is uncontradicted that when the master, in January and March preceding the disaster, asked for certain minor repairs, aggregating in cost less than $200, they were promptly made.

The following admission by the secretary, when asked why the company did not haul its barges out at regular intervals, summarizes the situation, and clearly indicates an unjustifiable failure to inspect the Calvert thoroughly from time to time, and instead to rely too much upon what her master might report: "Because they [the barges] are not covered by inspection coastwise, and the fact is that Mr. Hooper [the company's president] and I, or Mr. Walker, whenever they are around, go down and look them over, talk things over with the captains, and we have to depend more or less, especially when they are not in Baltimore, on what the captain tells us regarding repairs."

We have already considered the limited character of the knowledge that was fairly to be imputed to the master. The Calvert was in rather constant use the winter and spring preceding the disaster. Although she had carried perishable cargo, fertilizer, during this time, this cannot be accepted as proof of her seaworthiness on the 17th of May, in the face of what actually happened.

Having found that the various defects in the hull disclosed by Surveyor Mitchell cannot be attributed to the effects of the foundering or subsequent raising of the barge, or to any other known cause, and these defects being substantial and readily discoverable by any reasonably thorough examination of the vessel's hull, certainly, if she were drydocked, we are forced to the inevitable conclusion that what the company did through these officials was insufficient. It is true that those in charge of, and who made, such repairing as was done in the preceding March, testified that her condition at that time was good; but their testimony adds little to the testimony of the responsible officials of the company for two reasons: First, because the repairmen were not called upon to, nor did they then, or at any time within the preceding year, make a general inspection of the boat's hull, but restricted their work to requested repairs; and, second, the weight which might normally be given to testimony of this kind from repairmen is at least to some extent vitiated by the fact that since the disaster, and prior to the date of the present suit, the shipyard which these witnesses represented was taken over by the petitioner— a fact which may very naturally tend to color what these witnesses had to say.

There is evidence, to be sure, from the captain of another barge, that Capt. Insley, just before he began his fatal voyage, told him that the Calvert was in good condition; but, in view of the other testimony, this has no real probative value. It is also true that, although claimant demanded the production of a letter purporting to have been written by Capt. Insley to the company, complaining of the Calvert's leaky condition very shortly before the disaster, such letter was not produced. But the court likewise attaches little significance to these circumstances, because there is no actual proof that any such letter was written, or, if written, that it has been withheld.

The present situation appears to be not unlike that disclosed in Oregon Round Lum-

ber Co. v. Portland Asiatic S. S. Co. (D. C.) 162 F. 912, decided by the Oregon District Court in 1908, where the court held that the capsizing of a barge, similar in age and size to the Calvert, due to her unseaworthiness, was not without the privity and knowledge of her owner, although she had been twice extensively overhauled and repaired, the last time 5 years before, and although the superintendent and manager of the company had both been through her hold only a few days before, but without lights; the court holding that it did not appear that these officials had made more than a casual examination, nor had she been surveyed by any one properly skilled. In the course of its opinion, the court said, at pages 914, 922:

"The barge was of the model pattern, 170 feet in length, 38 feet beam, and about 8 feet depth of hold, and was constructed in 1877. There is but little testimony as to the manner of her use until after she was in a measure reconstructed in the year 1900. * * * No expert or other person was appointed or required by either the manager or superintendent of the lumber company to make a survey of the barge Monarch to determine with respect to her seaworthiness or fitness to undergo the service to which she was appointed under the demise; but these officers depended solely upon their own skill and ability for ascertainment as to her condition. * * * The O'Reillys were the manager and superintendent, respectively, of the libelant. They have testified fully as to their knowledge of the condition of the barge at the time of the demise. They show that each of them was in the hold of the barge from time to time, one of them only a short time before she was given into the charge of the Portland & Asiatic Company, and made observations as to her condition. But it is clear that neither of them made any critical or careful examination at any time, with proper lights to aid them in determining her condition."

The facts in The Republic, supra, while not entirely apposite, are sufficiently similar to support the conclusion now reached, and the following language (page 111 of 61 F.) from the opinion of the Circuit Court of Appeals, Second Circuit, in that case, is worthy of special note:

"The District Judge did not find, in terms, that the officers of the petitioner were aware of the unfit condition of the barge, but placed his decision against the right to limit liability upon the ground that there was an implied warranty on the part of the corporation that the barge was reasonably fit for the service for which she was chartered; that it was the duty of the corporation, before dispatching her upon the voyage, to know whether she was in a fit and seaworthy condition; that a prior examination of the vessel would have disclosed that she was not in such condition; and that that corporation was chargeable with knowledge of what its officers might have known, and were bound to know. Throughout the summer preceding the accident, as well as for several years previously, the barge had been employed in the immediate business of the corporation. The corporation was the lessee of various places of resort near the waters in the neighborhood of New York City, where it had an office; and it owned a number of tugs and barges, and its business was the conveying of excursion parties by its tugs and barges to and from these places of resort. The president of the corporation was personally cognizant, in a general way, with the condition of all the barges of the corporation, including the Republic. Among his other duties, he supervised the repairing of the barges; and he was accustomed to go over them once a year, to ascertain what repairs were necessary. In the spring of 1891 he examined this barge, and ordered some new stanchions put in. He testifies that he did not discover any unsoundness in the masts, and found no unsound stanchions, except those which he ordered removed and replaced by new ones. Yet at that time, in view of her condition as subsequently revealed, the masts and many of the old stanchions of the barge must have been so rotten that their condition could not have escaped his observation, if he had made a reasonably thorough examination."

In conclusion, the findings of the court are as follows: First, that the barge was unseaworthy; second, that her unseaworthiness was the proximate cause of her foundering; and, third, that her unseaworthiness was due to such neglect on the part of the managing officials of the company as to preclude the company from availing itself of the defense of limitation of liability, on the ground of lack of privity or knowledge. The petition must therefore be dismissed. An opportunity, however, will be afforded both petitioner and claimant to be heard further with respect to the amount of damages that are properly to be awarded claimant.