### Petition of W. E. VALLIANT & CO.
### THE E. MADISON HALL.
### No. 2582.

District Court, D. Maryland.
July 9, 1943.

John Henry Skeen, of Baltimore, Md., for petitioner.

George W. P. Whip, of Baltimore, Md., for cargo owner.

COLEMAN, District Judge.

This is a collision case. Rayonier, Inc., a corporation dealing in wood pulp, libeled the motor vessel E. Madison Hall, owned by W. E. Valliant & Co., for loss of a cargo of wood pulp in the amount of approximately $35,000, as a result of a collision on March 31, 1942, between that vessel and a sunken wreck off Turkey Point at the mouth of the Elk River, in upper Chesapeake Bay.

Thereafter, W. E. Valliant & Co. instituted in this Court a proceeding for exoneration from or limitation of its liability as owner of the E. Madison Hall, pursuant to the provisions of 46 U.S.C.A. § 183 et seq.

First, with respect to the cause of the collision, the facts are found to be as follows: The E. Madison Hall was a vessel 165 feet in length, 28 feet beam and 8 feet depth, of 212 gross tons. To her, Rayonier, Inc., had consigned, on or about March 21, 1942, approximately 435 tons of wood pulp at Fernandina, Florida, for transportation to Philadelphia, under bills of ladings which stipulated "the dangers of the sea only excepted." Between five and six a.m. on the morning of March 31st, while the E. Madison Hall was proceeding up Chesapeake Bay with this cargo, she collided with the oil barge Klondike which was lying partly submerged off Turkey Point, as a result of which the E. Madison Hall and her cargo became a total loss.

The master of the E. Madison Hall was approaching Turkey Point on the customary course for vessels of this type, namely, northeast by east, three-quarters east, although this was a little to the westward of the regular ship channel, which smaller boats were accustomed to avoid because of the increased number of larger vessels in this locality. There was no light on the wreck of the barge Klondike but merely a black can buoy. The barge was some three feet out of water for a width of several feet, and for some 200 feet of her length, she having an overall length of about 300 feet. The wreck lay, for the most part, just to the west of the channel, but several feet of it probably actually extended out into the channel itself. The wreck was not noted on the latest issue of the Government chart for these waters, although supplementary information regarding the wreck had been issued but the master of the E. Madison Hall had not yet received it in official form. However, his first mate was aware of the wreck, having passed it coming down the Bay two weeks previously on the same vessel. He told the master when he turned the wheel over to him, five minutes before the collision, that the wreck was nearby. Nevertheless, the master continued ahead at full speed, which was about seven and a half knots

He testified that he did not see any need to reduce speed because he thought he had already passed the wreck. Furthermore, he admitted violation of the rules as to pilots, and also a provision in the inspection certificate for his vessel in that he did not have, as specified, a first class pilot aboard. See United States Coast Guard General Rules and Regulations for Vessel Inspection, September, 1942, paragraphs 96, 37.

As already stated, just five minutes before the collision the master had relieved the first mate at the wheel. The latter was only an A. B. seaman. Daylight had not yet come. There was a light breeze blowing, with misty rain. The lookout, also an A. B. seaman, had been instructed to look out for the wreck, but was allowed to remain in the wheel-house, although the bow of the vessel was some 75 or 80 feet forward of the wheel-house.

There was no other recorded collision with this wreck while marked in the same way as on the night in question, although vessels had frequently passed it, going up and down the Bay, both day and night. Since it was right on the edge of the channel—if indeed a part of it did not actually stick out in the channel—it was customary for the masters of other vessels "to split" their range lights, namely, to run them on one side or the other, in order to be certain to avoid the wreck, which the master of the E. Madison Hall admitted he did not do. Some two weeks after the collision, the Government replaced the black can buoy with two lighted buoys.

■ It seems entirely clear from these facts that the master of the E. Madison Hall was guilty of negligent navigation. We may assume that the Government may have been too dilatory in placing lighted buoys at the wreck. However, this does not exonerate the master for the following reasons: He had been warned of the proximity of the wreck, but nevertheless failed to take the ordinary precautions which a prudent navigator would adopt under such circumstances, namely, he failed to stop or to reduce his speed; to use his searchlight, to post a competent lookout in the bow of his vessel, and last, but by no means least, to have aboard, as required, a first class pilot, the object of which was to provide his vessel with the necessary safeguard which would result from having on board one thoroughly familiar with conditions existing in this particular locality. The fact that the mate, just prior to being relieved at the wheel, had used the search-light, unsuccessfully, to locate the wreck, indicates his inadequate knowledge of the location of his vessel.

■ Second, as respects the question of exoneration from or limitation of liability, the statute lays down the prerequisite, in order to entitle a shipowner to the advantage of the statute, that the loss, damage or injury shall be "without the privity or knowledge of the owner." In the present case, the master of the E. Madison Hall testified that he had discussed with his superior, Mr. Valliant, the requirement contained in the certificate of the vessel's inspection, to have aboard a first class pilot but that, nevertheless, Mr. Valliant, because of the existing emergency and the difficulty, if not inability, to engage the services of such a pilot, made light of the requirement and instructed the master to proceed without one. There was no effort made to overcome or mollify this damaging admission of the master. Under such circumstances, there can be no question but that the vessel owner was in privity with the master with respect to the latter's negligence which, as we have just shown, was unquestionably one of the proximate causes of the disaster. Accordingly, the condition under which alone a vessel owner may have the benefit of the statute, has clearly not been met.

We have been referred to no case which is contrary to this conclusion, where the facts were at all similar to those before us. For example, in Southern Pac. Co. v. United States, 2 Cir., 72 F.2d 212, the evidence sustained a finding that the vessel's sailing without meeting the requirement of having aboard a first assistant engineer was not a contributing cause of the collision, and hence did not preclude the owner from obtaining limitation of liability. To the same effect is the decision reached in The Thessaloniki, 2 Cir., 267 F. 67, and The North Star, 2 Cir., 255 F. 955. There is nothing in Re Eastern Transportation Co., D.C., 37 F.2d 355, a decision of this Court (affirmed The Calvert, 4 Cir., 51 F. 2d 494, except as to amount of recovery), which is contrary to the conclusion we here reach.

A decree will be signed in accordance with this opinion, in favor of the cargo owner, Rayonier, Inc.