## THE CARROLL.

### In re EASTERN TRANSP. CO.
### No. 1839.

District Court, D. Maryland.
July 20, 1932.

Marbury, Gosnell & Williams, of Balti-
more, Md., for petitioner.

L. Wethered Barroll, of Baltimore, Md., and R. Arthur Jett, Jr., of Norfolk, Va., for administrator.

WILLIAM C. COLEMAN, District Judge.

This case arises on petition of the Eastern Transportation Company, as operator of the barge Carroll, for exemption from or limitation of liability under Revised Statutes §§ 4283–4285 (46 USCA §§ 183–185). The proceeding follows the institution of suits on the law side of this court by the representatives of the master and two of the crew of the barge Carroll who, with the other member of her crew, were lost as a result of her sinking on the afternoon of February 16, 1930, off the entrance to Delaware Bay.

The following are found to be the material facts in connection with the sinking of the Carroll: On the afternoon of February 14, 1930, petitioner's steel tug Montrose, 142 feet long, of 427 gross tons, with the three barges T. J. Hooper, Hallowell, and Carroll, in tow, in the order named, left Sewell's Point, Va., bound for New York. The tug had her full complement of officers and crew, and had passed government inspection the previous month. All three barges were loaded with coal but not to capacity, the Carroll being more lightly loaded than the Hallowell, but not more so than the Hooper. All hawsers were of proper size, condition, and length, about 200 fathoms between each barge, and 225 fathoms between the first barge and the tug. The Hooper, the largest of the three, was a ship's hull barge, drawing from 23 to 25 feet; the Hallowell, a Shipping Board wooden barge, smaller and more lightly loaded, drawing from 19 to 23 feet; and the Carroll, of the same type as the Hallowell, drawing from 19 to 20 feet, and loaded approximately the same as the Hallowell, that is, with somewhat over 2,100 tons, or about 1,000 tons less than the Hooper. She was ten years old, had been dry-docked three times during the preceding year, had undergone extensive repairs in the last two years, and, together with her metal life boat and equipment, had been passed as seaworthy by government inspection as late as January 30, 1930. Her crew of three (in addition to the master) was one in excess of the legal requirement.

Pursuant to rulings of this court, made as a result of exceptions taken to the Eastern Transportation Company's petition to limit liability, that company is considered as having had such interest in the Carroll as to be treated as though the actual owner for the purposes of this proceeding. Also, the value of both the tug and the barge was required to be included in the ad interim stipulation, they being treated as one vessel. The Columbia (C. C. A.) 73 F. 226; The Alvah H. Boushell (C. C. A.) 38 F. (2d) 980; Sacramento Navigation Co. v. Salz, 273 U. S. 326, 47 S. Ct. 368, 71 L. Ed. 663.

At the inception of the voyage, weather conditions were favorable, moderate northerly winds, clear, with no storm warnings announced. The Montrose proceeded up the coast by the outside course, and there was no material change in weather conditions, except for increasing cloudiness until the following afternoon when rain set in, the barometer falling, but not rapidly. That night, however, when the tug with her tow was about midway between Fenwick Island Light Vessel and Five Fathom Light Vessel, which lie 24 miles apart, Fenwick Island Light Vessel being 14 miles southeast by east of the entrance to Delaware Bay, the wind increased from the northeast, reaching gale force with a maximum velocity of 48 miles an hour, heavy snow, and a further drop in the barometer at midnight to 29.82. The master of the Montrose headed into the gale, deeming it safest to continue on his course in the hope of getting under the lee of Cape May, rather than to try to enter Delaware Bay and seek refuge behind the Breakwater, on account of the heavy tide, sea, and shoals to be reckoned with in such attempt. With this end in view, he attempted to work ahead in order to pick up Five Fathom Light Vessel and thence make a safe departure. The wind was changing to westerly, and he therefore considered that the Breakwater would be a poor harbor under such conditions for his deep draught tow. He thus fought the storm throughout the night, during a large part of which he had sternway.

Shortly after six a. m.—at daybreak—on Sunday morning, he blew the barges to anchor, one by one, not knowing, however, that at about that time the Carroll, the stern barge, and the first to be "blown off," had parted her hawser to the Hallowell and was adrift. She was able, however, to come to anchor as were the other two barges; the Hooper being compelled, however, to cut her hawser to the tug, because frozen in the bits. Each barge then lay at a considerable distance from each other, their location being approximately 8 miles southwest of Five Fathom Light Vessel. All three were provided with the requisite signal means—flags,

whistles, and red lights. If any distress signals were raised on any of them, none were seen, and those aboard the barges who testified, stated that while they knew the tug blew them to anchor, because they saw the steam from her whistle, it was not possible to hear the signal on account of the high wind and other adverse conditions. Thereafter, at about 10 a. m., the master of the Montrose, she being heavily ice-coated, shipping much water and laboring heavily in the seas, although not in actual distress, believing all three barges to be safe, proceeded for the Breakwater in the hope of meeting some vessel through which he might send a message for assistance in taking the barges into the lee of Cape May, and thus avoid leaving them at their then anchorage any longer than was necessary. But meeting no vessel, the master proceeded towards the Breakwater until he was sufficiently near to pass the word to a Coast Guard boat, cleared his tug of some of the ice and started back for his tow, coming in sight of two of the barges about 4 p. m. after having been absent for a matter of some six hours. Thereupon he discovered the barge Carroll was missing, and from the other barges, learned that she had foundered about 12, noon. For two hours he searched in vain for some sign of her crew. A day later her metal lifeboat was picked up by the Coast Guard to leeward of where the Carroll had anchored, containing the bodies of the master and one of the seamen; both had life belts on them. The boat was completely swamped, but kept afloat by her air tanks. The bodies were taken to New York, where death was officially reported as having been caused by exposure. The body of another member of the crew was washed ashore, and that of the remaining member was never found. It is not known whether they ever got into the Carroll's lifeboat.

It appears that on February 14th, three other tugs with tows had left Hampton Roads, bound up the coast, and that all of them successfully weathered the storm. One of them, the Nassau, with lighter draught barges, was some distance ahead of the others, so did not encounter the storm until in a more favorable lee position. Another, the Bermuda, also a lighter draught tow, took the inside course, was caught in the storm, and anchored her tow under the lee of Cape May. The remaining tug, the Kaleen, with three barges similar as to type, size, and cargoes, to the tow of the Montrose, was the only one that made an attempt to reach the Breakwater, if indeed she did actually so attempt, because the evidence is not entirely clear as to whether she may not have changed her course to the west, due to being virtually lost in the storm and her tow out of control. She anchored and rode out the storm near Over Falls Lightship. The Kaleen had a radio receiving set but the Montrose had none, and the former's master testified that his change of course was due to the receipt by radio on Saturday of storm warnings. Of all those who were qualified to testify, and did testify, on the question of proper navigation, the master of the Kaleen was the only one who criticized adversely the course adopted by the master of the Montrose, and the latter's action was affirmatively supported by the mate of the Kaleen. The master of the Montrose had been long in the towing service, and had towed the Carroll many times previously, both light and loaded. The master of the Carroll, who perished with her, was making his first trip on the Carroll, although he had had considerable experience in towing service.

We must determine: First, was the Montrose negligent in her navigation and care of her tow in such manner as directly contributed to the loss of the Carroll? Second, was the Carroll seaworthy, both with respect to her own hull and her equipment? We will consider these two questions in the order named.

On the question of navigation, claimants contend that the Montrose was negligent in (1) that her master was inexperienced; (2) that he failed to anticipate the storm, and thereafter seasonably to maneuver to a place of safety; (3) that he both failed to circle the barges, whereby he might have ascertained the Carroll's peril, and left them at a critical time.

In a proceeding of this kind, the happening of an accident to a tow does not in itself raise any presumption of negligence on the part of the tug, and the burden of proving negligence is upon the party seeking to charge the tug with liability, namely, upon the claimants here. The Director (C. C. A.) 21 F. (2d) 47; The Calvert (D. C.) 37 F. (2d) 355; Id. (C. C. A.) 51 F. (2d) 494. That is to say, with respect to the question of navigation which we are now separately considering, claimants must show not merely an error of judgment on the part of those in charge of the tug, but a lack of that degree of prudence that a master, possessing ordinary skill and experience, would have exercised under the given circumstances. A disaster which befalls a vessel supplies the knowledge that comes after the event, but

does not necessarily impeach the judgment of those who decided that it was safe to do what was done. Of course, a master should use every reasonable safeguard, giving heed to all available sources of information respecting weather conditions, including the radio, because, although, as we will presently point out, we do not find that the absence of a radio on the Montrose in any way directly contributed to the loss of the Carroll, nevertheless the standard of due care is not necessarily dependent upon mere statutory enactment but must be tested in the light of advancing knowledge, experience, and the most modern appliances of navigation which have become recognized as regular equipment by common usage. The T. J. Hooper (D. C.) 53 F.(2d) 107.

■ We conclude from the unquestioned weight of the credible evidence in the present case that Captain Simmons of the Montrose was not incompetent for the task in hand, although his experience on ocean-going tugs was relatively limited; and that it was not negligent navigation for him to attempt to hold his course as he did, and to head into the storm, rather than to seek refuge behind Delaware Breakwater. The fact that most navigators under the given circumstances might not have done what he did is in no sense conclusive, but as a matter of fact, the masters of two of the three other tugs who encountered the same conditions elected to do exactly the same, and it is at least open to serious question from the state of the evidence, whether Captain Snyder of the Kaleen did seek the Breakwater until he found himself in a predicament where there was nothing else for him to do. Laying a course for the Breakwater meant placing the tow to the broadside of the wind and sea, thereby exposing the barges to the full force of the gale and increasing their jeopardy. Therefore, to say that the master of the Montrose should not have attempted to work up as nearly as possible to Five Fathom Light Vessel, and from there to obtain a safe departure for Cape May, as against letting his tow have the full broadside of the gale and the risk of being blown upon the shoals, is tantamount to saying that a court of admiralty must substitute its own judgment for that of an experienced seaman, faced with actual conditions, and called upon to meet quickly a serious emergency. The Mohegan (C. C. A.) 28 F.(2d) 795. The best proof of the soundness of this statement lies in the fact that no evidence whatsoever has been produced, other than that of Captain Snyder of the Kaleen, an obviously biased witness—

a former employee of the petitioning company—that what Captain Simmons did was not exactly the right thing to have done under the circumstances. Also, the soundness of Captain Simmons' conduct is further corroborated by the fact that the master of the Kaleen was not successful in doing what he claimed he endeavored to do, namely, to make the harbor of refuge behind the Breakwater. The Kaleen, being further in shore when she anchored her tow than was the tug Montrose when she anchored hers, had, it is true, the advantage of smoother water, but this was offset by the other dangers to which we have already alluded. See The Eastern (C. C. A.) 280 F. 711; The Covington (D. C.) 128 F. 788.

■ But claimants further contend that had the Montrose been equipped with a radio receiving set, she would have been warned as early as the morning of Saturday, February 15th, that the gale was impending, and should then have laid her course for the Breakwater, and presumably might have been able to reach it before the storm attained its height. However, the radio broadcast of Saturday morning, which Captain Snyder testified he received, was merely in the nature of information that fresh winds and unsettled weather were likely at hand; and even the broadcast of Saturday evening, so far as the area between Sandy Hook and Hatteras was concerned, merely announced strong north winds, possibly preceded by rain the following day; and while it did forecast a northeasterly movement of a disturbance off Hatteras, it did not predict its reaching gale force until off the southeast New England Coast, all of which was not sufficiently alarming for the area in which the Montrose then was, to require her master to make any radical alteration in his course. But above and beyond all of this, assuming, as we may, that the Montrose should have been equipped with radio, and if so would have received, at or about 10 o'clock on the night of February 15th, this foreboding report, it would, as we have seen, have been too late to escape the gale. Therefore, we cannot say that there is any causal connection between the failure to have radio equipment and the position in which the Montrose found herself when the gale was at its height.

■ There still remains to be considered whether Captain Simmons' failure to examine the barges more closely, and to stand by them, amounted to negligence. Claimants contend that he should have circled the barges before leaving them at anchor and seeking

help, and that, had he done so, he would have detected the distress of the Carroll. But there is no credible evidence to support this contention. While the three barges were being brought to anchor (which was the proper thing to do under the circumstances) and until the Montrose left, the testimony is uncontradicted that they were all visible to the Montrose, that Captain Simmons looked them over through his glasses, and found nothing to indicate that any one of them was then in need of help. There is no claim that their anchors were not holding. Therefore, it is not to be assumed that a closer approach to the barges on the part of the Montrose would have disclosed any untoward condition before she departed, seeking assistance, which was highly advisable, in the absence of possessing radio sending equipment, which we are not disposed to consider a requisite on coastwise tugs. Had the Montrose remained away from her tow an unreasonable length of time this would have been inexcusable. What is an unreasonable length of time must be determined by all of the particular circumstances of the given case, and much must be left to the discretion of the master of the tug. Thus tested, we cannot say that Captain Simmons was negligent in his regard for his tow, but, on the contrary, his absence of some six hours was warranted under the circumstances. It was in fact impelled by common sense in his effort to obtain help for the tow. See The Director (C. C. A.) 21 F.(2d) 47; The A. L. Walker (D. C.) 45 F.(2d) 621.

Claimants stressed the fact that Captain Simmons, testifying before the local steamboat inspectors, stated that he sought assistance from the Coast Guard at the Breakwater because his barges were in danger of sinking; but this is not to be construed as meaning in danger of sinking within the near future, because to do so would be equivalent to charging the captain of the Montrose with wanton disregard of human life, to which all of the other credible evidence in the case is directly opposed. It is significant that there is not a single eyewitness testifying to the exact time when, or exactly how, the Carroll sank; that is to say, with what rapidity she went, whether by the head or by the stern, etc.—a fact which is presumably largely explained by the constant preoccupation of all those on each of the other two barges with pumping, and otherwise helping their vessels to ride out the storm. But whatever the reason, the approximated time of the Carroll's foundering, some two hours after he departed, is further confirmatory of the fact that Captain Simmons was reasonably justified in his assumption that he could make his need for help known, and return before an emergency might take place. While the weather reports show that from midnight until 7 a. m. on February 16th, the wind at times attained a velocity as high as 48 miles per hour, it thereafter steadily declined, until in the afternoon, when the tug returned, the hourly velocity did not exceed 24 miles per hour, and was only 19 miles per hour at noon—the time the Carroll was reported to have gone down. Thus, these facts further support the reasonableness of the master's conduct.

Turning now to the second question, namely, whether the barge was seaworthy, the burden of proving seaworthiness rests upon the owner; but if seaworthiness be not established, claimants must still prove causal connection between unseaworthiness and the sinking. If such is shown, then the burden shifts to the owner, seeking limitation of liability, under Revised Statutes, §§ 4283–4285 (46 USCA §§ 183–185), to establish that the unseaworthiness was without its privity or knowledge, and, further, in a proceeding of this kind, presumption of unseaworthiness only arises when the vessel sinks from unknown causes, under such circumstances that nothing but unseaworthiness can explain the accident. The Calvert, supra.

It appears that the barge Carroll was ten years old, having been built in 1920; that more than $5,000 had been spent in repairs upon her in the years 1928 and 1929; that in 1930, approximately $1,000 had been so spent; and that she had been in dry dock for searching and caulking in May and August, 1929, and also in September of the same year, the latter occasion, however, being merely for the purpose of repairing a leak at her rudder post. On the voyage just preceding her fatal one, she was in collision with another barge in New York Harbor, after which she was not dry-docked, but repairs above her water line, resulting from this collision, were made, subsequent to which, on January 30, 1930, that is, a fortnight before she went down, she was inspected by the United States government inspector and certified as seaworthy in every respect, including her life boat equipment. Captain Collins, who had been master of her for a number of voyages, and had been in command until just before she left Norfolk on February 14th, testified that at that time he considered her seaworthy, that while leaking about 18 to 20 inches in 12 to 14 hours, this

was no more than she was accustomed to do, and was not abnormal for a barge of her type. Depositions were taken of the men who repaired her just a few days prior to her last voyage. They testified that all necessary repairs were made; that her pumps also were in good condition. In short, that she was in every sense seaworthy.

There is no credible evidence to contradict this testimony. In fact, not a single witness testified that the barge at the inception of the voyage was in fact unseaworthy, but claimants seek to have that inferred from the amount of repairs that had been made—the three dry-dockings that had taken place within a period of some six months, from the amount of leakage that her former master testified to, and from the fact that her above-water repairs, made just before her last voyage, were not reported to the local inspector, as is claimed was required by the inspection rules which we may assume to be correct, but which proves nothing with respect to the question now before us. In addition, the two masters of the Carroll from 1920, when she was first put in commission, down to the time when Captain Collins took charge of her, testified that she was hauled out each year, searched and caulked, and kept in a seaworthy condition. The following testimony of Captain Collins is significant:

"Q. Was there any damage on the boat that was not repaired up to the time the boat left Norfolk on her last trip? A. No sir. * * *

"Q. What would you say as to the seaworthiness of the Barge Carroll? A. I thought she was in pretty good shape.

"Q. Seemed to be tight? A. Yes sir.

"Q. Seaworthy in every respect? A. Yes sir.

"Q. What would you say as to her being a weak or a strong barge? A. She was about the same as I had been on; same as the others. * * *

"Q. Was she leaking some? A. No, nothing to speak about."

He had made four trips on the Carroll, and was fully familiar with the latest repairs that had been made upon her. The character of his testimony, when viewed in the light of the fact that he had been discharged from command of her, which might have impelled him to disparage her condition, is further persuasive upon the court of the fact that mere inferences of unseaworthiness are not to be accepted in the face of testimony of this kind.

Adequate lifeboat equipment and the proper maintenance of such equipment were of course equally essential to proving seaworthiness of the barge in the sense that it must here be understood, because even though the barge herself may have been staunch and tight, if she were not equipped with reasonably adequate facilities to enable her master and crew to keep afloat for a reasonable length of time, if it became necessary to abandon her for any cause and under any conditions of wind and sea known to occur in this area, then the barge cannot be considered as having been in a seaworthy condition. Beyond this the legal obligation does not go. However, it is not necessary to analyze in detail the fragmentary testimony relating to the condition of the lifeboat and its equipment when found, because the affirmative testimony of petitioner that they were in first-class condition at the inception of the voyage is not contradicted except by mere inferences, made from circumstances which are of no probative value. The lifeboat had been recently repaired, and was certified as being seaworthy, just a few days prior to the inception of the voyage, by responsible repairmen. Captain Collins testified that she was in good condition and fully equipped when he turned the barge over to Captain Keith. In addition, all of this had passed the United States inspection on January 30th.

Throughout the cross-examination of petitioner's witnesses and in claimant's brief, much stress is laid upon the fact that at the time the lifeboat was picked up with the bodies of the master and one of the crew, one of the bailing checks was defective, as was also part of the launching equipment. There is testimony—some of it conflicting and meager—to the effect that the rubber ball in one of the checks was missing, and that a wooden plug was found in the boat, indicating that this had been improvised in order to keep the boat from leaking. But it becomes unnecessary to determine the exact weight to be given to this testimony, because it is in no sense conclusive of the condition of the life boat and equipment when the barge began her voyage. In the absence of some credible testimony tending to overcome the affirmative testimony that the lifeboat and her equipment were in first-class order at that time, it is obvious that such defects as those complained of may have been brought about by the emergency conditions which existed at the time the lifeboat was lowered, or later on during the struggle with wind

and sea. This being true, it is all the more obvious that testimony relating to the condition of the lifeboat after she had been abandoned for some eight months, and exposed to the corrosive action of the elements, is of no probative value. It is not reasonable to suppose that a lifeboat in a gale of the type that raged on the particular night would have avoided shipping water, regardless of any hole in her bottom, and the action of the heavy seas may easily have accounted for the bailing check being impaired, if the metal cap was not secured in its place when the boat was launched, which, for aught that appears in the evidence, was not done; and may have accounted also for her two occupants losing all equipment and control of her, and ultimately expiring from immersion and exposure. She did not become completely submerged, because she was equipped with air tanks which were found to be intact. But she was completely swamped and gave evidence of having been put to the supreme test. Exactly what happened on the barge and in the lifeboat, during those last hours, will never be known because the lips of those who were the only actual witnesses have been forever sealed. Suffice it to say that we find insufficient evidence to overcome what we believe to be the more credible evidence that the lifeboat at the time of the foundering of the barge was of proper size and type, seaworthy, and properly equipped as part of the life-saving equipment of a vessel of the Carroll's type. Indeed, very persuasive evidence of the fact that the lifeboat was adequate, and adequately equipped under the circumstances, is the fact that she was still not wholly submerged, a day later. It is highly probable that she was swamped in launching.

Summarizing our findings, we reach the conclusion that by the weight of the credible evidence both the Carroll and her lifeboat were seaworthy at the inception of the voyage. What therefore actually caused her to founder, whether there were one or many contributing factors, it becomes unnecessary—indeed is impossible—to determine. Among the more plausible conjectures is that which the master and mate of the Montrose advanced, namely, that the Carroll's pumps may have broken down, or that she may not have been as skillfully handled as the other barges. An even more reasonable theory is that her seams opened, or that certain parts of her keel or hull gave way under the abnormal stress of the gale. The obligation that a vessel shall be seaworthy does not contemplate an absolute guaranty

that she can withstand all conditions of wind and sea to which it may be reasonably anticipated she may be subjected during such voyages, and with such cargoes, as are customarily assigned to her. That is to say, although a presumption of unseaworthiness at the inception of the voyage does arise in the case of a vessel becoming unseaworthy after entering upon the voyage, where there is no apparent cause from stress of weather, collision, or negligent navigation, this presumption is rebutted by the existence of one or more of these factors. In other words, perils of the sea from which it is reasonable to assume that the vessel sprang a leak, may overcome the presumption. Any other principle for testing seaworthiness would result in imposing upon the owners of the vessel, particularly of the type of the Carroll, an obligation which would be unreasonable in its enforcement.

It is well recognized that all wooden barges, particularly those carrying coal and other bulk cargoes, leak to some extent. How much they may leak before the danger zone is reached, is incapable of being controlled by any fixed mathematical rule. The amount allowable before the vessel's safety is impaired must be determined by a number of factors. The rule laid down in The Calvert, supra, namely, that seaworthiness of a vessel of the Carroll's type, carrying her accustomed cargo in normal weather, cannot be made to depend upon her pumps or how often they are used, is perhaps the best composite rule that can be adopted. In the present instance, the Carroll was known to leak under normal conditions about 18 to 20 inches in 12 to 14 hours, that is, somewhat more than an inch an hour. The statement that this amount is not abnormal for a barge of this type is not, we find, successfully rebutted by any of the credible evidence, and we are prepared to accept this conclusion.

There are so many circumstances which clearly differentiate the present case from that of The Calvert, supra, that it seems almost unnecessary to dwell upon them. It is true the Calvert was found to be unseaworthy, but she was a vessel nearly three times as old as the Carroll, and had not been drydocked for a year and a half before she foundered in Chesapeake Bay in calm weather. There was no evidence that any repairs had been made upon her, following a stormy voyage which she had taken a few weeks before; only a comparatively small amount of repairing had been done for a year and a quarter prior to the disaster; and, further, there was no evidence of any surveys having

been made, which would undoubtedly have shown her exact condition prior to the disaster. She, unlike the Carroll, was an inland barge, and therefore not subject to compulsory government inspection. Thus the two cases are in no sense parallel. In the case of the Carroll there had not only been recent, but periodical, dry-dockings, searching, and caulking, and, all in all, what must be taken as reasonable care to see that the barge was kept in a seaworthy condition before each voyage, culminating in the government inspection a fortnight prior to her last voyage.

It may be asked why did the other two barges in this tow, as well as all of the barges in the other three tows making the same trip, at the same time, survive and the Carroll did not? Why, for example, did the Hallowell, with approximately the same cargo, weather the storm in spite of the fact, as was testified, she had 7 feet of water in her hold? Here again to attempt to answer this question brings us into the realm of speculation, because the knowledge of many factors, undisclosed by the record, is a condition precedent to an intelligent answer to the question. Suffice it to say that the fact of one vessel's ability to remain afloat under given conditions is not sufficient to raise a presumption of another vessel's unseaworthiness, if she sinks under the same conditions of wind and sea. Seaworthiness must be tested by a more precise rule and the condition of each vessel determined by known factors, not by mere prima facie parallel situations which, at most, are slightly persuasive but not at all conclusive, of the condition sought to be proved.

Having thus found that both the Montrose and the Carroll were seaworthy at the inception of the voyage, and also properly navigated, it follows that petitioner is exempt from liability for loss or damage ensuing from her sinking. Therefore, it becomes unnecessary to interpret the limitation of liability statute (46 USCA § 183). However, even if it be assumed that the petitioner has not sustained the burden of proving seaworthiness of the Carroll, it may still limit its liability, if the loss incurred was without its privity or knowledge. "Privity" means some fault or neglect in which the owner personally participates. "Knowledge" means personal cognizance or means of knowledge of which the owner is bound to avail itself, of contemplated loss or condition likely to produce or contribute to loss, unless proper means are adopted to prevent it. Mere negligence does not necessarily establish existence on the part of the owner of such privity or knowledge, which, in the case of a corporate owner, must be that of its managing officials, amounting to actual negligence or omission on their part to maintain the vessel in a seaworthy condition. The Calvert, supra, and cases cited. Thus tested by the foregoing requirements of the statute, it is equally indisputable that the weight of the credible evidence fails to disclose any actionable neglect on the part of the officials of the Eastern Transportation Company in the present case. A sufficient review has already been made of the evidence bearing upon this point to indicate that every reasonable effort was made to comply with all accepted standards, in order to make the Carroll staunch and fit for the voyage that she undertook.

In concluding, the court feels required to allude to, and to deprecate, the unwarranted amount of deposition testimony in the case. The court is, of course, fully aware of the fact that in proceedings of this kind ability to obtain the testimony of those following the sea is largely restricted, and that, therefore, resort must more frequently be had to depositions than is true in the usual law and equity proceedings. However, in the present case, the court is not criticizing the number of witnesses whose testimony was taken, but rather the amount and character of such testimony. The transcript comprises more than 1,000 pages of depositions, 23 persons deposing on behalf of the petitioner, and 8 on behalf of claimants. A careful examination of all of these depositions satisfies the court that fully one-half of the 1,000 pages consists of immaterial matter, or trivial exceptions taken to the introduction of certain parts of the testimony, and of useless sparring between counsel. The triviality of these objections is further confirmed by the fact that they were subsequently dropped in toto. Such practice is to be condemned. If not in fact unethical, at least it burdens the trial court in an inexcusable manner, tends to befog the issues and, all in all, has a decided tendency to delay, if not to defeat, the reaching of a just conclusion on the material facts. The criticism here made applies to the methods adopted by counsel for each side, because each appear to have indulged in the same practice.

For the aforegoing reasons, the petition of the Eastern Transportation Company is granted, and the claims dismissed, with costs to the petitioner.