Arthur OLSEN, Libelant,

v.

The Fishing Vessel PATRICIA ANN, her engine, tackle, apparel and furniture, Frederick H. Schreiber, Jr., Claimant Respondent,

and

The Patricia Ann Fisheries, Inc., and Raymond Bishop, Respondent Impleaded,

and

International Indemnity Insurance Co., Respondent Impleaded.

Civ. A. Nos. 20503, 20516.

United States District Court
E. D. New York.

June 5, 1957.

**316**

Arthur B. Sheehan, and William A. Leahy, New York City, Proctors for libellant, by Arthur B. Sheehan.

Mahar & Mason, by Frank C. Mason, New York City, Proctor for claimant.

Kreis & Kreis, by Maurice M. Kreis, New York City, Proctors for respondent impleaded, The Patricia Ann Fisheries, Inc.

RAYFIEL, District Judge.

On July 23, 1956 Arthur Olsen filed a libel *in rem* against the Patricia Ann, a fishing vessel, wherein he demanded damages in the sum of $25,000 for personal injuries which he had sustained on July 28, 1955, while employed as a cook on said vessel, and for maintenance and cure. He based his claim on the alleged unseaworthiness of the vessel. Thereafter the Patricia Ann was duly attached by the United States Marshal for this district, and is still under his control.

Fredrick H. Schreiber, Jr., duly appeared as claimant herein and answered the libel, denying generally the allegations of unseaworthiness, and claiming, also, the extinguishment of libelant's claim because of laches in the commencement of his action, due, in part, to the facts and circumstances next hereinafter set forth.

On September 5, 1956 the claimant filed his petition impleading Patricia Ann Fisheries, Inc. and Raymond Bishop, the respondents herein. The petition alleged that on April 6, 1956 he purchased the vessel from the respondent Patricia Ann Fisheries, Inc. for the sum of $10,000, under an agreement wherein the said respondent warranted the title thereto, and agreed, further, to indemnify the claimant against, and save him harmless from any claims outstanding against the vessel. The petition stated, in addition, that the respondent, Raymond Bishop, simultaneously with the delivery of the said agreement, and in order to induce the claimant to purchase the vessel, delivered to the latter his statement under oath to the effect that there were no claims against the vessel except those set forth in a schedule thereto annexed, which did not include the claim asserted in the libel, of which the claimant had no notice.

On August 16, 1956 the libelant filed a libel *in personam* against the respondent Patricia Ann Fisheries, Inc. to recover damages in the sum of $25,000 for the aforementioned injuries, and for maintenance and cure, basing his claim on the unseaworthiness of the Patricia Ann and the negligence of the respondent, its agents, servants and employees.

On October 11, 1956 Patricia Ann Fisheries, Inc. filed its petition impleading International Indemnity Insurance Company, hereinafter called International, demanding that it be required to pay any damages found to have been sustained by the libelant, the claimant and the petitioner.

By an order dated November 21, 1956 the causes of action herein were consolidated. On November 27, 1956 International's default was noted, and an order was made directing that a decree be entered against it after the trial of this action, as consolidated, for any damages adjudged in favor of the libelant against Patricia Ann Fisheries, Inc. or the Patricia Ann, to the extent of the limit of the policy issued by Interna-

tional, to wit, $10,000 and costs, and that a decree may be entered against International in favor of Patricia Ann Fisheries, Inc. for such damages as it might be able to prove it had sustained by reason of the breach of its contract of insurance. Pursuant to notice theretofore served on libelant's counsel, the respondent, Patricia Ann Fisheries, Inc. moved on the trial to amend its answer by adding the defense of "limitation of and exoneration from liability."

The facts follow. On or about July 20, 1955 the libelant obtained employment on the Patricia Ann as a cook, and shortly thereafter the vessel left Lind Basin, in Gravesend Bay, New York, for a point on the high seas off the coast of New Jersey, where it was to engage in dragging for scallops. At or about 4:00 p. m. on July 28 the libelant, in the course of his preparation of dinner for the crew, left the forecastle and proceeded to the deck at the stern of the vessel to obtain sea water for cooking purposes. He was carrying a pot of approximately five quart capacity. At the stern of the vessel there was a hose through which sea water was discharged from time to time to clean the scallops which had been brought aboard through the dragging operation. The libelant placed the hose into the pot, filled it with water, and then began his return to the forecastle. He had proceeded only a short distance when he suddenly fell to the deck and sustained a fracture of the right femur and other injuries. The vessel immediately returned to New York, arriving there on July 29, and the libelant was removed to the Beekman Downtown Hospital, where he remained until December 23, 1955, when, since virtually the maximum improvement in his condition had been effected, he was discharged, and requested to return for outpatient treatment, which he received on only three widely separated occasions thereafter. Maintenance payments commenced upon his discharge, and continued thereafter at the rate of $50 per week for thirty successive weeks, when they were discontinued, whereupon libelant commenced this action.

The libelant claims that his injuries were sustained when he fell to the deck of the vessel as a result of its wet and slippery surface. It is his contention that the Patricia Ann was unseaworthy, due to the presence on its deck of water, oil and so-called debris, consisting of scallops, scallop shells and starfish. While it is undoubtedly true that at various times during the operation of the vessel there was an accumulation of water, scallops and scallop shells, there was no reliable proof that there was any oil on the deck. The vessel was equipped with an auxiliary oil tank, located at the stern end of the vessel's deck, but there was very convincing evidence that the tank had been emptied of its contents not later than 48 hours after it left Lind Basin, and some 6 days prior to the accident.

There was testimony to the effect that from time to time during the scallop-cleaning operations the deck would be washed and thereby cleared of the accumulation of scallops, shells and other matter. Even if it were true that there was such debris on the deck at the time of the accident to the libelant, there was no proof whatsoever that *it* was responsible for his fall. The libelant testified that he did not know what caused him to slip, and there were no eyewitnesses of the accident. The libelant testified that water was continually coming through the scuppers and across the deck at the point where he fell, and (S.M. P.P. 51, 52) (S.M. p. 44) that the weather was rough, causing the vessel to roll and pitch, and sea water to cross her deck. He did not testify that he saw oil on the deck.

The other witnesses who testified in behalf of the libelant as to the occurence of July 28, 1955 were Kurt Carlson, John Iversen, Jr., and John Iversen, Sr. Carlson is a brother-in-law of the libelant, and resided in the latter's home for some time prior and subsequent to the accident. He testified that he was asleep at

the time Olsen was injured (S.M. p. 94) and first learned of it when he was awakened as Olsen was being lowered into the forecastle shortly thereafter. He testified that he had seen oil on the deck during the trip, but that the last time he had seen it was about three days prior to the accident. It may be added, incidentally, that he was far from frank and forthright in his testimony.

Iversen, Jr., who was engineer and mate of the vessel, testified that he was not on deck between noon and 4:00 p. m. on July 28, when the accident occurred. In answer to a question as to where he was between those hours, he stated: "I was off, gone likely down below sleeping" (S.M. p. 240). Respecting the issue involving the presence of oil on the deck, he testified (S.M. p. 246) that the contents of the deck tank had been emptied into the main tank within a period of 24 hours after the commencement of the trip, (July 20) and in answer to the question "Would it empty the tank completely?" he stated: "I believe most likely completely." Even if there had been some seepage from the oil tank before its contents had been removed—and there is no reliable testimony that there was—the regular washing of the deck by the use of the hose, and the continual shipping of sea water through the scuppers and across the deck, would unquestionably have washed the deck clear of such oil. He testified, further, that he did not examine the deck of the vessel after the accident, and did not know what caused Olsen to fall.

Iversen, Sr., the master, was in the wheelhouse at the time of the accident, and first learned of it when, as he testified, he "heard the commotion". He assisted members of the crew in removing Olsen to the forecastle and into a bunk.

That was the extent of the evidence offered by the libelant in support of his claim of unseaworthiness and negligence.

It is my opinion that the libelant has failed to establish that at the time he fell there was an accumulation of oil, or of scallops, shells or other debris, on the deck. I am satisfied that the deck was wet as a result of the constant flow of sea water over and across it, but it cannot be said that a fishing vessel of the type of the Patricia Ann was unseaworthy, or her owners negligent, because of so transient and impermanent a condition as a wet deck, caused, as it was in the instant case, by conditions of sea and weather. Those were conditions expected to be faced by men following the calling of seamen.

In the case of Roberts v. United Fisheries Vessels Co., 1 Cir., 141 F.2d 288, the Court said at page 292, "If a seaman is injured in one of the normal hazards of the business, without fault on the part of anyone else, the ship being seaworthy and equipment perfect, he stands or 'assumes' the loss himself, subject, of course, to the ancient right of 'maintenance and cure'. He is held to assume the ordinary risks of his occupation, of which negligence of the owner or master is not one. This is true under the Jones Act [46 U.S.C.A. § 688] as well as under the general maritime law * * *", and at page 293 of 141 F.2d, "But where the injury or death is not the result, in whole or in part of the negligence of the employer, or his agents, the provision (respecting the defense of "assumption of risk") has no effect to change the rights or remedies of the parties, and, in the case of a seaman, he takes the same risks of his calling as he did before under admiralty law. By the Jones Act he is given a right of action for the negligence of his employer which he did not have before, but the usual risks of the calling are not shifted on to the employer if the employer is guiltless of any fault." (Matter in parenthesis added) See also The Cricket, 9 Cir., 71 F.2d 61.

I conclude, therefore, that the libelant has failed to sustain his burden of proof as to the unseaworthiness of the Patricia Ann or the negligence of her owners.

We come now to the claim for maintenance and cure. It is the contention of the respondent, Patricia Ann Fisheries, Inc. that the master chartered

the Patricia Ann under an arrangement whereby he agreed to pay her owners for her hire a sum equal to 35% of the money realized from the sale of the catch, and, hence, that he was owner thereof *pro hac vice*. It contends, further, that it had no control over the hiring of the crew, the selection of the fishing grounds, the person or firm to whom, or the price at which, the catch should be sold, or the manner in which the remaining 65% of the proceeds thereof were to be distributed, all of which, it claims, were controlled by the charterer (testimony of Raymond Bishop (p. 317 S.M.). The libelant, on the contrary, contends that he was engaged as a cook by the master, acting in behalf of Patricia Ann Fisheries, Inc., the owner of the vessel. For the following reasons, among others, I am inclined to resolve that issue in favor of the libelant. Iversen, Sr., the master of the vessel, testified (pp. 267, 288 S.M.) that the purchaser of the catch paid some $2,500 therefor in checks aggregating that amount; that one check, representing 35% of the proceeds, went to Patricia Ann Fisheries, Inc., the owner, as its share of the proceeds of the catch; that each member of the crew, including the master, received his share, after deductions for withholding and social security taxes; that, in addition to his share as a member of the crew, the master received *from the owner* 5% of the proceeds *for running the vessel*, a payment hardly consistent with its claim that he chartered the vessel; and, finally, that the check representing the withholding and social security taxes deducted from the shares of the members of the crew *was drawn to the order of the owner*, and *delivered to it and endorsed by it*. This last-mentioned fact was confirmed by the testimony of Raymond Bishop, Secretary-Treasurer of the owner. (p. 282 S.M.)

■ I am, therefore, of the opinion that the libelant, because of the injuries which he sustained, became entitled to maintenance and cure. But what should be the extent thereof?

In the case of Farrell v. United States, 336 U.S. 511, at page 517, 69 S.Ct. 707, at page 710, 93 L.Ed. 850, the Court said:

"The problem of the sick or injured seaman has concerned every maritime country and, in 1936, the General Conference of the International Labor Organization at Geneva submitted a draft convention to the United States and other states. It was ratified by the Senate and was proclaimed by the President as effective for the United States on October 29, 1939. 54 Stat. 1693. Article 4, paragraph 1, thereof, provides: 'The shipowner shall be liable to defray the expense of medical care and maintenance until the sick or injured person has been cured, or until the sickness or incapacity has been declared of a permanent character.' * * * The Department of Labor issued a summary of the Convention containing the following on this subject: 'The shipowner is required to furnish medical care and maintenance, including board and lodging, until the disabled person has been cured or the disability has been declared permanent.' Robinson, Admiralty, p. 300. * * * That the duty of the ship to maintain and care for the seaman after the end of the voyage only until he was so far cured as possible, seems to have been the doctrine of the American admiralty courts prior to the adoption of the Convention by Congress, despite occasional ambiguity of language or reservation as to possible situations not before the court. It has been the rule of admiralty courts since the Convention."

■ Recovery of maintenance and cure should not extend beyond the time when the maximum degree of improvement in the health of an injured seaman has been reached. See Luksich v. Misetich, 9 Cir., 140 F.2d 812, at page 814, and cases therein cited.

■ As hereinbefore stated, the libelant received maintenance payment of $50 per week for 30 successive weeks, commencing with his discharge from the hospital in December, 1955. That ap-

**320**

pears to me to be an adequate, if not ample period for such payments. Accordingly, libelant's claim for maintenance and cure is denied.

In view of the foregoing disposition, it is unnecessary to pass upon the other issues involved herein.

Submit proposed findings of fact, conclusions of law and decree in comformity herewith.