Matter of Petition of **CHEROKEE TRAWLER CORPORATION** as Owner of **THE CHEROKEE**, for exoneration from or limitation of liability.

No. 304.

United States District Court
E. D. Virginia,
Newport News Division.
Dec. 20, 1957.

Jett, Sykes & Howell, Henry E. Howell, Jr., and R. Arthur Jett, Norfolk, Va., for petitioner.

Ferguson, Yates & Stephens, Newport News, Va., Baird, Crenshaw & Lanning, Norfolk, Va., William Ferguson, Newport News, Va., Edward R. Baird and Francis N. Crenshaw, Norfolk, Va., for claimant.

WALTER E. HOFFMAN, District Judge.

On April 9, 1956, the trawler Cherokee, owned by petitioner, Cherokee Trawler Corporation, left her home port at Hampton, Virginia, for the purpose of fishing off the North Carolina coast. The catch on the following day was good and the vessel drifted that night. The master of the Cherokee first learned of Northeast storm warnings at 6 A. M. on Wednesday, April 11. Fifteen minutes later he issued instructions to haul up the nets and return to Hampton Roads. Encountering a violent storm with heavy and freak seas the trawler was nearly

capsized at approximately 4:30 P. M. The master first headed the vessel into the wind for approximately ten minutes, but finally, when the pumps would not cope with the water in the engine room, he directed that the trawler be beached. When the crew sighted the beach and the vessel hit the reef, the five men went overboard and made their way to shore, a distance estimated at 100 yards. All of the crew members were exhausted, particularly claimant's intestate, Jack Bradshaw, but they finally made their way to the woods where they remained that night during the rain and cold. At 5:30 A. M. on April 12, three of the crew met an employee of the Little Island Coast Guard Station. Another crew member, Drew, remained with Bradshaw who died from exhaustion shortly after the three crew members had departed to obtain assistance. The trawler Cherokee, in some miraculous manner, had made its way over the outer reef to the beach during the night of April 11, where it was observed at 8:05 P. M. with the lights still burning in the engine room. Bradshaw expired at a point three-fourths of a mile from where the Cherokee beached.

There was no intimation of adverse weather conditions when the trawler left port on Monday. In fact, the first warning was released at 10:10 P. M. on Tuesday, April 10, in the form of "small craft warnings with winds estimated from 25 to 35 m.p.h. for Wednesday". At 3:50 A. M. on April 11, the following report was issued:

"Change small craft warnings to Northeast storm warnings. Strong to gale force Northeast."

From that point on the force of the storm increased steadily. The U. S. S. Nevada, while not in close proximity to the Cherokee, reported from the general area that the height of the waves was 11 feet, that it had gone through winds up to 60 m.p.h., and recorded the wind at 1:30 P. M. at 38 knots, east-northeast. The City of Norfolk recorded a 62 m.p.h. wind, and two freighters went aground off Cape Henry. It was the highest wind recorded for the month of April during a period of 26 years. The greatest turbulence was reported to be immediately South of the Virginia-North Carolina line, the locality where the trawler was beached. While gale force winds must be anticipated by owners of vessels charged with the obligations of seaworthiness, the conditions prevailing on April 11 give credence to the descriptions of the freak seas encountered at 4:30 P. M. on that afternoon.

Subject to minor variations, the surviving crew members relate substantially the same experiences. Drew, the cook, stated that he relieved Bradshaw at 4 A. M. on April 11, at which time no reference was made to any leaks in the engine room or any faulty operation of the pumps. Later during lunch and supper (4:00 P. M.) nothing was said by way of complaint with respect to leaks in the engine room or failure of the pumps. While the seas were heavy and the wind strong, the crew did not appear to be apprehensive as to the safety of the vessel or crew while she was moving nearly parallel to the seas on a course northwest by north destined for Hampton Roads. With the heavy wind on the starboard beam, while Drew and Smith were in the galley eating supper with Hudgins at the wheel and Bradshaw in the engine room, a tremendous sea hit the starboard side of the trawler, causing her to lean over to the port at an angle of approximately 45°. Immediately thereafter another sea went over the trawler before she finally righted herself. The engine room doors were open and Bradshaw, the engineer, reported that he was not injured but had "taken in a lot of water". Drew and Hudgins testified that, after the trawler righted itself, Hudgins was relieved at the wheel by Captain Mansfield and the two made their way to the doors of the engine room which were open. Drew estimated approximately three inches of water on the engine room floor. Bradshaw advised both men that the engine room "had taken in a lot of water" and "we will never make it". Drew started pumping but Bradshaw said "there was no use" and "we might as well go up the mast".

The trawler was equipped with a one inch Viking bilge pump operating directly off the main engine, a one and one-half inch Lister diesel engine driving a Gould pump, a one and one-quarter inch Japsco electric pump, and two manual pumps—one forward and one aft of the wheelhouse. The Japsco and Lister pumps were connected with the fish hold, after bilge, and engine room bilge. All pumps were in operating condition when the boat left its home port, as well as all day Monday and Tuesday. When the vessel "lay to" during Tuesday night, the main engine was not running and the Viking bilge pump was, of necessity, cut off. The evidence does not reveal how long the Lister pump was in operation on Tuesday night, but there is testimony to the effect that Bradshaw stated "he might have to pump her all night". At the time of the freak seas described herein, the Viking bilge pump was operating properly and continued to do so after the trawler was nearly swamped. When the crew endeavored to start the Lister pump following the heavy seas, it would not operate. The manual pump aft of the wheelhouse (which was effective in the engine room) could not combat with the flow of water which had accumulated in the engine room. Following the beaching of the trawler the Lister engine was disassembled, washed and cleaned, reassembled, and then operated. Sand was found in the engine. Testimony discloses that water running down an air manifold would prevent the Lister engine from operating, and logic dictates that the heavy seas caused the cessation of its operation. From this evidence the Court is unable to find that any unseaworthy condition existed with respect to the pumps.

There are statements to the effect that Bradshaw was required to operate the pumps morning and night while the vessel was in port. On these occasions, however, the trawler was loaded with ice preparatory to her next voyage. There are inferences that, by reason of the required pumping, the boat was leaking, but there is no affirmative evidence as to

this point and Bradshaw told Drew that he was uncertain as to whether the boat was leaking or the ice was melting. Smith, a crew member, stated that Bradshaw had mentioned the fact that the boat was leaking slightly, but not "bad enough" to keep her in port. But none of the crew testified that they had observed any leak prior to the commencement of the fatal voyage on April 9, and aside from the remarks attributable to Bradshaw, the record is silent with respect to any suggestion of leaks. During the middle of March, while the Cherokee was approximately 75 miles off Cape May, New Jersey, Bradshaw reported a leak and the Captain returned to port where the flooring was removed, a leak was observed in the suction line running from the fish hold to the pump, the pipe was repaired, and the flooring replaced. When the trawler returned to Hampton Roads during the latter part of March, a machinist from the Moon Shipyard visited the boat and repaired a leak in the cylinder head at which time he overheard a conversation between Forrest, the president and general manager of the petitioner corporation, and Bradshaw. Forrest asked Bradshaw if there was any necessity for the boat to go on the ways, to which Bradshaw replied that, since the suction line had been repaired, there had been no trouble with any accumulation of water in the hold. As Bradshaw was referred to as "particular and careful", it is logical to assume that he would have registered a complaint at the time if one existed. Kane, the machinist, further testified that he examined the engine room at the time and did not notice any water, which he would have undoubtedly seen if any had been near the floor. It should be stated that, at the time of Kane's visit, the vessel was probably not iced as they were in the process of unloading fish.

██ Over objection of petitioner, evidence was introduced in behalf of the claimant that Bradshaw had told his brother that the Cherokee was leaking approximately three or four weeks prior to April 11. Similarly, the claimant,

Alma Smith Bradshaw, testified, over objection by petitioner, that she responded to a telephone call from Forrest and overheard her husband, Bradshaw, say, "I can keep the water out of her if the pumps hold up", and "She needs to go on the railway". Claimant first stated that this alleged conversation took place about March 1, 1956, but later revised her approximation of time indicating that it occurred immediately prior to the last or next to the last trip. Forrest denies this alleged conversation. Ruling on the admissibility of this testimony was reserved by the Court. Claimant urges that the evidence is admissible under § 8–286 of the Code of Virginia, 1950, and pursuant to Local Admiralty Rule 24 which provides that proceedings in admiralty shall be taken in the same manner as under the Federal Rules of Civil Procedure if said Rules were applicable in admiralty, if not otherwise prescribed by statute, by the rules promulgated by the Supreme Court, or by the Local Rules. Neither of these positions may be successfully maintained. The Virginia statute has been interpreted as making no attempt to change the traditional objection to evidence which is purely hearsay, and which would be inadmissible under any circumstances. Carter Coal Co. v. Litz, D.C.W.D.Va., 54 F.Supp. 115, affirmed, 4 Cir., 140 F.2d 934. Bradshaw's alleged statements were certainly not a part of the *res gestae*. Chappell v. White, 182 Va. 625, 29 S.E.2d 858; Beck v. National Surety Corp., 5 Cir., 171 F.2d 862; Bonner v. Texas Co., 5 Cir., 89 F.2d 291. In the absence of an applicable statute the statements are clearly hearsay. Jones on Evidence, Vol. 2, pp. 1636, 1642, 1643. The questioned evidence is inadmissible but, even though considered, it is too uncertain in point of time to lend weight to the factual issue presented.

It is argued with much force that the Cherokee was an "old boat". This statement is admitted. She was originally built during World War I as a 110 foot sub-chaser. It was purchased by the Forrest interests in 1941 for a price of $2,000, the hull being described as in "poor condition". She was converted into a fishing trawler at a shipyard in Crittendon, Virginia, where seventy-five percent of the hull planking was replaced and her framing, decking and deck beams were renewed. It is said that approximately 43,000 board feet of lumber and 13,000 man hours of labor were required to bring about the conversion. Since 1941 the trawler has been engaged in off-shore fishing except for such time as she was out of service for repairs and overhaul. The evidence is without contradiction that the Cherokee was taken to the railway twice each year, generally in May and October, where her hull was inspected, planks renewed when necessary, and caulked. It is unnecessary to detail this evidence other than to note that all parties referred to the condition of the vessel, including the hull, as "excellent" or "good" when she left the railway in October, 1955. Representatives of two shipyards testified that Forrest made no effort to avoid making any necessary repairs.

That some leaks undoubtedly will develop in a wooden hull vessel is conceded. This is not, however, the test of unseaworthiness. The mere fact that the crew chose to beach the trawler carries with it no presumption of unseaworthiness. The Suduffco, D.C.S.D.N.Y., 33 F.2d 775. Unless the leaks are noticeable to the extent of raising a reasonable doubt in the minds of reasonable persons as to the safety of the vessel, unseaworthiness cannot be successfully established merely by pointing to the age of a wooden hull vessel and to the fact that it may spring an occasional leak. In the opinion of this Court evidence of unseaworthiness and negligence is lacking.

This position is fortified by the condition of the vessel after she had pounded across an outer bar to reach her resting place on the beach. The surveyor for the United States Salvage Company inspected the trawler on April 13 and described the structural timbers to be in good condition, although he was only able to examine approximately seventy percent of the underwater portion of the

hull. The trawler was viewed with the thought of engaging in salvage operations and one experienced boat builder dug under the vessel to examine her bottom where he found the timbers to be in good shape. The salvage operations failed by reason of the location of the boat and the intervention of a second severe storm approximately ten days thereafter. The trawler was later raised, floated, anchored and burned, after the engine and all equipment had been removed and taken ashore, but during all these operations the hull withstood the strain.

The original proceedings herein were instituted by the claimant seeking a recovery under the Jones Act, 46 U.S.C.A. § 688. Petitioner, Cherokee Trawler Corporation, thereupon brought this proceeding to limit its liability or to be exonerated therefrom. The doctrine of limitation of liability presupposes that a liability exists which is to be limited, but if no liability exists, there is nothing to limit. The 84-H, 2 Cir., 296 F. 427. The claimant has the burden of proof of establishing liability. The Titanic, 2 Cir., 225 F. 747, 141 C.C.A. 19. Once negligence is established, the burden rests upon the petitioner seeking limitation of liability to prove seaworthiness and lack of privity. The third and final question to be determined in the sequence of events is the contributory negligence, if any, of the claimant.

Finding that petitioner is entitled to a decree of exoneration makes it unnecessary to review other pertinent questions raised by the pleadings and evidence. The cause of the disaster was the storm and freak seas of extraordinary intensity and falls within the exception as stated in The Cleveco, 6 Cir., 154 F.2d 605, 615, wherein it is said that:

"* * * storms relied upon to explain the loss of a vessel in rebuttal of a claim of unseaworthiness must be shown to have been of extraordinary intensity."

The fact that other vessels may have weathered the storm under conditions which may have been entirely different is insufficient, in and of itself, to justify a finding of unseaworthiness or negligence. The Carroll, D.C.Md., 60 F.2d 985, 993.

If called upon to find as a fact whether Bradshaw was an employee of petitioner, the Court would conclude that he was so employed, despite the evidence that the trawler was operated on the "Hampton Lay" basis, with sixty percent of the proceeds of the catch being paid to the crew and forty percent going to the owner. It is apparent that Bradshaw was not hired as engineer until Forrest approved such action. Additionally, on two prior occasions, engineers had been hired by Forrest. While there was no specific requirement as to where the vessel would sell its fish, practice established over a period of years revealed that one firm generally took the entire catch and Forrest had selected this firm. These facts, together with the filing by petitioner of the customary W-2 forms providing for withholding taxes, lead to the conclusion that Forrest, as the petitioner's principal stockholder and general manager, sufficiently controlled the crew to establish an employer-employee relationship. The authority of Forrest to hire and fire Bradshaw is abundantly established by proper inferences which may be drawn from the evidence. Hudgins v. Gregory, 4 Cir., 219 F.2d 255; Southern Shell Fish Co. v. Plaisance, 5 Cir., 196 F.2d 312; Hill v. Atlantic Navigation Co., D.C.E.D.Va., 1954 A.M.C. 2150, reversed on other grounds, 4 Cir., 218 F.2d 654; Olsen v. The Patricia Ann, D.C.E.D.N.Y., 152 F.Supp. 315, 1957 A. M.C. 1544.

There is insufficient evidence to conclude that Bradshaw was guilty of contributory negligence but, as this point is no longer in issue, it would unduly prolong this opinion to recite the facts which lead to this determination.

If we were to assume that the trawler was unseaworthy, the question of "privity" is not free from doubt. Without the damaging testimony of claimant as to the alleged telephone conversation between Bradshaw and Forrest, it is diffi-

cult to comprehend that petitioner had knowledge, or should have had knowledge, of any unseaworthy condition. If this statement is to be admitted and accepted as true, petitioner would not have met the burden imposed upon it.

Taking the evidence as a whole, it is abundantly clear that the Cherokee was maintained in good condition, that a competent, sufficient and efficient crew manned the vessel, and that during the increasingly heavy seas encountered on the fatal day not a single crew member registered any complaint with respect to any alleged leak which may fairly be attributed to the foundering of the trawler. The conclusion is inescapable that the seas of extraordinary intensity constituted the true cause of the vessel's beaching.

Proctors for petitioner will prepare a decree in accordance with this opinion which is adopted by the Court as its findings of fact and conclusions of law pursuant to General Admiralty Rule 46½, 28 U.S.C.A., and, after presentation to proctors for claimant for inspection, said decree shall be presented to the Court for entry.