In the Matter of Petition of John T. CLINTON as Owner of the Fishing Vessel THE OLYMPIC II for Exoneration From and Limitation of Liability.

No. 58–52.

United States District Court
D. Massachusetts.

June 22, 1961.

Daniel J. Dempsey, Boston, Mass., for plaintiff.

William T. Conlan, Boston, Mass., Samuel H. Cohen, Boston, Mass., for defendant.

CAFFREY, District Judge.

John T. Clinton, owner of the Oil Screw Fishing Vessel Olympic II, has filed a petition for exoneration from or limitation of liability.

I find that the Olympic II was a fishing dragger 40′ long, 11½′ wide, with a net tonnage of 9½ tons. It was purchased by Clinton on July 30, 1955 for $6,000. Thereafter it was used for commercial ground fishing as a dragger for scallops. Normally it put out to sea on one-day trips and returned to port each evening.

I find that petitioner Clinton is employed as the manager of a retail liquor package store and is not a fisherman or experienced in fishing or in the operation or maintenance of fishing vessels. The evidence indicates, and I find, that Clinton had no intimate or firsthand knowledge of the condition of the Olympic II at any material time. He never inspected the vessel and had no knowledge as to her seaworthiness, staunchness, or tightness, nor as to the condition of her equipment, which included a twoway radio, life preservers, generator and engine, a canvas-covered dory, pumps, compass, fishing tackle, etc. Following his purchase of the Olympic II, Clinton employed LeBaron Davis as Master from 1955 to 1957, and thereafter the Master was Raymond C. Hamlin. Clinton had known Hamlin since at least 1946 as a friend and knew him to be an experienced commercial fisherman. Hamlin, like Davis, was put in complete charge of the operation and maintenance of the Olympic II and I find that Hamlin was instructed not to leave the dock with the vessel when she needed any repair, no matter how minor.

Petitioner made arrangements for the maintenance of the vessel by the Plymouth Marine Railways, Inc., a company experienced in the maintenance of the fishing fleet. I further find that Clinton had established credit with the Plymouth

Marine Railways and that an annual haul and various other repairs were performed by that company when necessary, and that an annual haul of the Olympic II was made in September of 1956 and again in May of 1957. During the period July 1955 to April 1958, petitioner paid the Plymouth Marine Railways $3,634 for maintenance and repairs of the Olympic II. He also paid various other parties substantial sums during this period, and as late as April of 1958 he paid parties other than Plymouth Marine $295 for maintenance and repairs. Clinton was last aboard the Olympic II in July of 1957 and last saw her at Scituate, Massachusetts, in early 1958.

Hamlin made the fishing trips in the Olympic II accompanied by one or two crew members whose identity changed from time to time. I find that the Olympic II made two one-day trips in January of 1958 with Hamlin and one Macasse aboard; that it made no fishing trips in February of 1958; that it made four one-day fishing trips in March of 1958 with Hamlin, one Fenton, and one Burton aboard; and that it made three one-day fishing trips in April of 1958 with Hamlin and Fenton aboard. The last fishing trip prior to the fatal trip which gives rise to this litigation took place on April 25, 1958.

Earlier in April of 1958, the Olympic II went aground on North River Beach in Scituate, Massachusetts, because of a lost rudder. At this time, the Plymouth Marine Railways, under the supervision of George Davis, Vice President and General Manager, installed a new rudder. I find that George Davis is an expert in repair and maintenance of seagoing vessels and that in fact his company services the entire Plymouth, Massachusetts fishing fleet and has done so since 1948, and that the company under his supervision likewise services some 150 to 200 yachts. I find that Mr. Davis has had a personal familiarity with the Olympic II since 1948 and that

he was aware that she was rebuilt in 1946 in New Bedford as a 120 horsepower Diesel complete with a whole new bottom and a new keel. Mr. Davis testified that at the time of making the repairs in April of 1958 he made what he described as a cursory but general examination of the entire vessel and that he more particularly examined the stern area in the immediate vicinity of the rudder, the lower part of the keel, and the underwater gear. He stated that when he went through the vessel everything looked all right and that, in his opinion, the Olympic II did not as of April 1958 require any stern repairs other than the replacement of the rudder, which was done. Mr. Davis also testified that the Olympic II was constructed with watertight bulkheads and that she would not sink overnight due to a leak. He further testified that she had been rebuilt for dragging operations and that dragging operations would not impose any excessive strains upon her seams.

Some time prior to May 12, 1958 Hamlin employed Gene A. Mitchell as crew member to replace Fenton. On May 12, 1958, the Olympic II put out to sea with Hamlin and Mitchell aboard and was never seen again. Approximately three days later, the lifejacket-clad bodies of Hamlin and Mitchell were found floating in Cape Cod Bay, Hamlin approximately three miles and Mitchell approximately six miles north of East Dennis, Massachusetts. Neither the Olympic II nor any wreckage, stripping or trace thereof has ever been found, and I find and rule that the Olympic II was and is a total loss.

Arthur S. Hamlin, Administrator of the Estate of Raymond C. Hamlin, and Blanche Mitchell, Administratrix of the Estate of Gene A. Mitchell, have filed separate civil actions seeking recovery for conscious suffering and death of their respective intestates. These actions are presently pending in this court, but prosecution thereof was restrained by a

monition and restraining order entered by Judge McCarthy on December 1, 1958. In the instant case, petitioner Clinton seeks exoneration from or, in the alternative, limitation of liability, pursuant to the provisions of 46 U.S.C.A. § 183, and alleges that the loss occurred without his privity and knowledge. Since the Olympic II has zero value after the accident which gives rise to this litigation, petitioner on the facts of the case, as a practical matter, is seeking complete exoneration.

In Coryell v. Phipps, 317 U.S. 406, at page 411, 63 S.Ct. 291, at page 293, 87 L.Ed. 363, Justice Douglas speaking for the Court stated:

> "In the case of individual owners, * * * privity * * * means some personal participation of the owner in the fault or negligence which caused * * * the loss or injury. * * * That construction stems from the well settled policy to administer the statute not 'with a tight and grudging hand' * * * but 'broadly and liberally' * * *. One who selects competent men to store and inspect a vessel who is not on notice as to the existence of any defect in it cannot be denied the benefit of the limitation as respects a loss incurred by an explosion during the period of storage, unless 'privity' or 'knowledge' are to become empty words."

In The 84/H, 1923, 296 F. 427, at page 431, the Court of Appeals for the Second Circuit stated:

> "The privity or knowledge must be actual and not merely constructive. * * * There must be some fault or negligence on his (owner's) part or in which he in some way participates."

In The Princess Sophia, D.C.W.D. Wash.1921, 278 F. 180, 188, the Court stated:

> "Privity or knowledge * * * imports actual knowledge causing or contributing to the loss or knowledge, or means of knowledge of a condition of things likely to produce or contribute to the loss without adopting proper means to prevent it."

To the same effect, see The Carroll, D.C.D.Md.1932, 60 F.2d 985, 993, and Petition of Liebler, D.C.W.D.N.Y.1937, 19 F.Supp. 829.

■ I find that petitioner Clinton selected and employed a competent Master in Raymond C. Hamlin and that petitioner made the necessary financial arrangements with the Plymouth Marine Railways, Inc., a competent and experienced shipyard, to properly maintain and care for the Olympic II. I further find that if Mr. Hamlin failed in some way to carry out his instructions, Mr. Clinton was unaware of this failure and was not chargeable with knowledge thereof.

■ In claimants' brief, much stress is placed on The Cleveco, 6 Cir., 154 F.2d 605; upon The Republic, D.C., 61 F. 109; and upon The Mormackite, D.C., 147 F.Supp. 816, all having reference to the question of privity. The owner seeking exoneration in each of these cases was a corporation and it is clear from the cases that knowledge imputable to an individual owner and a corporate owner is not the same. See Benedict on Admiralty, Vol. 3, 6th Ed. pp. 384–387. See, also, Gilmore and Black, pp. 700–701:

> "The individual owner * * * will not in any case be responsible for the acts of the Master or crew even when the ship is in port and thus theoretically subject to control."

■ Quite over and above the problem presented by the lack of knowledge or privity on the part of petitioner Clinton, which I resolve in favor of the petitioner, the claimants in the instant case are faced with a substantial additional difficulty, namely, that no evidence was adduced on the basis of which a finding can be made as to the *actual* cause of the

foundering of the Olympic II. On this issue the claimants bear the burden of proof. The 84/H, 2 Cir., 296 F. 427, 432. The evidence adduced at the trial was not sufficient to establish that the Olympic II was unseaworthy when she put out from port. Absent an existing condition of unseaworthiness to which the foundering could probably be ascribed, it would be sheer speculation to attempt to decide the cause of the loss, and *a fortiori* it is impossible to find that petitioner Clinton was privy to or had knowledge of an indeterminable cause or condition.

On page 4 of claimants' brief they suggest several propositions which they submit are consistent with the unseaworthiness of the Olympic II by reason of a number of possible defects. The difficulty with this contention is that while all of the contingencies mentioned in this argument in the brief are possible, the evidence is inadequate to establish that *in fact* any one or combination of them *did* cause the foundering, and, more importantly, the evidence fails to establish that petitioner Clinton had knowledge of or was privy to any of these possible causes of the vessel's foundering.

I am persuaded that the petitioner has discharged his burden of proving the negative of the claimants' allegation that he had knowledge of or was privy to the causes which led to this tragedy. I am likewise persuaded that claimants have failed to sustain the affirmative of the proposition that negligence chargeable to the petitioner was the operative cause of the sinking of the Olympic II.

As was pointed out in The 84/H, supra, 296 F. at page 431:

"The whole doctrine of limitations of liability presupposes that a liability exists * * *. If no liability exists there is nothing to limit. * * * if no liability is found to exist the absence of all liability is to be decreed."

The petition for exoneration is allowed.